2019 IL App (1st) 170136-U

FOURTH DIVISION
December 26, 2019

No. 1-17-0136

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 91 CR 23697-02 |
| LORENZO GUYE, | ) ) | |
| Petitioner-Appellant. | ) ) ) | Honorable Kenneth J. Wadas, Judge Presiding. |

JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County where the eighth amendment of the United States Constitution does not prohibit life sentences imposed upon adult offenders and the court properly considered petitioner's youth and its attendant characteristics when sentencing him.

¶ 2    Petitioner Lorenzo Guye appeals the circuit court of Cook County's denial of his motion for leave to file a second successive postconviction petition pursuant to the Illinois Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2016)).  On appeal, petitioner

contends his life sentence for an offense he committed when he was 18 years old violated the United States and Illinois Constitutions where the trial court did not consider the characteristics associated with his age or alleged intellectual disability prior to sentencing him. For the following reasons, we affirm.

¶ 3                                     BACKGROUND

¶ 4     Petitioner, age 18 at the time of the offense, was indicted by a grand jury in 1991 of multiple counts of first degree murder, attempted murder, and aggravated discharge of a firearm. The following evidence was adduced at petitioner's trial.

¶ 5     On August 15, 1991, Chicago Housing Authority officers (officers) Jimmie Haynes (Officer Haynes), William Browder (Officer Browder), and Sharlene House (Officer House) were patrolling the interior of a building located in the Robert Taylor Homes on the 4500 block of South Federal Street. The officers exited the building with Silas Noble (Noble), the building's janitor. As they proceeded to the officers' vehicle, they heard several gunshots. Officer Haynes was shot in the hip and collapsed. As the shooting continued, Officer House and Noble dragged Officer Haynes toward the officers' vehicle and out of the line of fire.

¶ 6     Officers Browder and House transported Officer Haynes to the hospital, where he died from a single gunshot wound. A .223 caliber bullet, which was most often used in rifles, was recovered from the radio Officer Haynes carried. The testimony indicated that this bullet could have been fired from an AR-15 semiautomatic rifle.

¶ 7     Antwan Hughes (Hughes) testified at trial that at the time of the incident he was 14 years old and a member of the Gangster Disciples street gang. The Gangster Disciples claimed certain buildings in the Robert Taylor Homes as their territory. The Black Disciples, a rival gang, claimed the remaining buildings. On the evening of the offense, approximately 20 to 30

members of the Gangster Disciples, including petitioner, attended a meeting behind their buildings where they discussed retaliating against the Black Disciples. Several of the gang members made threats to the Black Disciples, and petitioner promised to "f*** up one of them CHA [(Chicago Housing Authority)] pigs."

¶ 8    Hughes further testified the Gangster Disciples held a second meeting that night in one of their buildings. Hughes recognized petitioner, as well as Ellean Nance (Nance) and an individual named Darnell, at this meeting.[1] Petitioner was armed with a rifle with a scope attached, Nance was armed with a firearm known as a Mach 10, and Darnell was armed with a .32 caliber automatic pistol. During the meeting, a Chicago Housing Authority police vehicle was parked in front of a nearby building which was claimed by the Black Disciples. The Gangster Disciples exited the rear of their building and Hughes ran to his residence in the Robert Taylor Homes. As he ran, Hughes observed petitioner, Nance and Darnell open fire at the building in front of which the Chicago Housing Authority police vehicle was parked. After Hughes entered his residence, he observed petitioner running through one of the Gangster Disciples' buildings. Petitioner was no longer carrying the rifle.

¶ 9    The State published a written statement which was prepared by a Cook County state's attorney after he questioned petitioner and which petitioner reviewed and signed. The statement indicated that petitioner believed the officers were allied with the Black Disciples. The basis of this belief was due to the fact that the officers were constantly "hassling" members of the Gangster Disciples. On the day of the offense, petitioner learned that several officers had stopped and frisked a group of Gangster Disciples without justification. Prior to the gang's first meeting on the evening of the offense, petitioner observed officers push a member of the

---

[1] Hughes did not know Darnell's last name.

Gangster Disciples. The gang member then struck one of the officers and all of the officers drew their weapons, causing petitioner to leave the scene.

¶ 10    Petitioner further stated that after the gang's second meeting that evening, he was informed that members of the Black Disciples were entering the Gangster Disciples' territory. He then retrieved his AR-15 and ran to the side of a building controlled by the Gangster Disciples. He observed several individuals exiting a building controlled by the Black Disciples, including 2 or 3 officers, and fired the rifle in their direction. He thought he struck a member of the Black Disciples. Petitioner then ran into a building and stashed the rifle in an incinerator. Several weeks later, petitioner learned the Chicago police were searching for him in connection with the shooting. When police officers searched the residence in which petitioner was living, they discovered petitioner hiding in a closet.

¶ 11    Lionel Williams (Williams) testified that on the evening of the offense, he observed petitioner carrying a .9 millimeter Tech handgun and a .357 caliber handgun. The next week, Williams overheard petitioner state that Chicago police officers were searching for him and he thought he shot an officer.

¶ 12    Petitioner presented evidence indicating that investigators did not recover rifle ammunition casings from the scene.

¶ 13    After closing arguments, petitioner was found guilty of first degree murder, two counts of attempted murder, and aggravated discharge of a firearm. The trial court subsequently determined that petitioner was eligible for the death penalty as he was 18 years old at the time of the offenses and the victim was a peace officer.

¶ 14    The matter proceeded to a sentencing hearing where the State presented the following evidence regarding petitioner's prior offenses. Chicago police officer Gregory Callaway (Officer

Callaway) testified that in January 1989, he was called to an apartment in the Robert Taylor Homes where he found Robert Davis (Davis), petitioner's cousin, on the floor having been shot in the neck. Davis died as a result of the wound. Officer Callaway learned that petitioner was attempting to unload or decock a handgun when it accidentally discharged, striking Davis. Petitioner was charged with reckless conduct, adjudicated delinquent in juvenile court, and sentenced to the Illinois Youth Center. He was released on parole in October 1989.

¶ 15    The State also submitted a stipulation of the facts recounted in *People v. Dajuan Banks*, 260 Ill App. 3d 464 (1994), Dajuan Banks being petitioner's alias. In that case, three months prior to the instant offense, petitioner and a codefendant opened fire into a group of unarmed members of the Black Disciples. Three individuals were struck and wounded. Petitioner was apprehended by Chicago police officers while running from the scene with a .357 caliber handgun. He was convicted of three counts of aggravated battery with a firearm, and three counts of aggravated discharge of a firearm. Those convictions were affirmed on appeal.

¶ 16    In mitigation, petitioner's mother, Shirley Guye (Shirley), testified petitioner's father never acknowledged that petitioner was his son. She testified petitioner failed 7th grade, repeated it, then moved directly into 9th grade. Petitioner was then enrolled in special education classes but was ridiculed by his classmates and ultimately dropped out. The State, however, introduced rebuttal evidence that petitioner was regularly absent from 7th grade prior to his failing that grade and from high school prior to dropping out.

¶ 17    Shirley further testified that when petitioner was approximately 11 years old, he suffered a head injury which caused him to lose consciousness and receive treatment at a hospital. Shirley additionally stated that after accidentally killing Davis, petitioner "distanced himself from reality" and from her as "it was very hard for him to deal with" the incident. Shirley also

admitted that she used to openly sell drugs in front of petitioner in order to support her family, and that defendant's brother was detained in the Illinois Department of Corrections (IDOC).

¶ 18    Dr. Michael Gelbort (Dr. Gelbort) testified on behalf of petitioner as an expert in the field of clinical psychology.  In August 1993, he performed a neuropsychological test on petitioner, called the Halstead Reitan test, which tested petitioner's cognitive functioning.  Dr. Gelbort also reviewed petitioner's health records, academic records, and the results of a different type of psychological examination performed by Dr. Susan Messina (Dr. Messina) which tested petitioner's intellectual functioning.  Dr. Gelbort opined that his testing revealed a "notable abnormality," specifically that "one half of [petitioner's] brain does not work nearly as well as the other."  Dr. Gelbort explained that this abnormality was exemplified by petitioner's IQ scores from the Halstead Reitan test.  He testified that a "normal" IQ score is around 100.  The dominant, verbal, left hemisphere of petitioner's brain produced an IQ score of 75 points.  The non-dominant, visual, right hemisphere of petitioner's brain, by contrast, produced a score of around 97-100.  Dr. Gelbort testified that petitioner's abnormality was also exemplified by his verbal memory test, in which he tested "slightly above average," compared to petitioner's visual memory test, which placed him between the 4th and 10th percentiles.  Dr. Gelbort opined that petitioner was "in the borderline range of mental deficiency," but that his tests were affected by the fact that he was regularly absent from school.

¶ 19    Dr. Gelbort further testified the evaluation revealed petitioner had "some difficulty with impulsivity, *** with judgment, with reasoning, with the ability to appreciate the ramifications of one's own behavior."  Petitioner also had difficulty recognizing "appropriate kinds of behavior" or how to "size up a situation correctly."  Dr. Gelbort opined that "while there could be some personality attributes leading to that kind of behavior, there certainly is evidence of

organic dysfunction, brain dysfunction that would lead to that kind of behavior as well." He further testified, however, that petitioner was capable of conforming his behavior to accepted norms of conduct and could appreciate the criminality of his acts.

¶ 20    According to Dr. Gelbort, petitioner's condition could have been the result of a congenital problem or a traumatic brain injury that occurred early in petitioner's life. He opined that the forceps used during petitioner's birth, in conjunction with petitioner's head injury, could account for his "neurological defect." However, no MRI or EEG was ever performed on petitioner.

¶ 21    Pertinent to this appeal, the record includes the results of Dr. Messina's evaluation as the trial court granted petitioner's request for an IQ test, ordered that such a test be performed by the Psychiatric Institute of Cook County, and further ordered that the results be provided to the State's Attorney's office. Dr. Messina conducted a Wechsler Adult Intelligence Scale test on petitioner in July 1992, which tested petitioner's intellectual functioning. The test revealed petitioner received a verbal IQ score of 75, a performance IQ score of 106, and a full scale IQ score of 85, which placed him in the "low average" range of intellectual functioning.

¶ 22    Petitioner's presentence investigation (PSI) report indicated petitioner dropped out of high school in 11th grade, he had no history of employment, and he was supported by his mother. The PSI further revealed petitioner had no contact with his father, but "got along well" with his family, including his mother, two sisters, and his brother. Moreover, according to the PSI: petitioner stated he spent his free time with his six children; he reported that he was in good mental health but abused alcohol, having started drinking at the age of five; and he denied using drugs, but reported that he had been a member of the Gangster Disciples for eight years.

¶ 23    The State argued for the imposition of the death penalty and maintained the statutory

mitigating factors weighed against petitioner, specifically: (1) petitioner had a history of prior criminal activity; (2) the murder was not committed while petitioner was under the influence of extreme mental or emotional disturbance; (3) petitioner did not act under the compulsion of threat or menace of the imminent infliction of death or great bodily harm; and (4) petitioner was personally present during the commission of the offense. See 720 ILCS 5/9-1(c) (West 1994). In response, defense counsel recounted petitioner's neuro-psychological history and family history, and urged the trial court to spare petitioner's life given his background, age, and any doubts as to whether petitioner, rather than Nance or Darnell, had shot Officer Haynes. Petitioner declined to speak in allocution.

¶ 24    In ruling on petitioner's sentence, the trial court stated that it observed petitioner's demeanor and considered the evidence in mitigation. The trial court also indicated it had reviewed the PSI. The court then made the following findings. Petitioner's statement that he enjoyed spending time with his children was a mitigating factor. Petitioner had significant criminal convictions, including aggravated battery with a firearm, aggravated discharge of a firearm, and two convictions related to the death of another human being. Nevertheless, sentencing courts have been directed by the appellate court to consider "the prospects pursuant to our constitution that this person can be restored to useful citizenship, what are his chances for rehabilitation." Although petitioner had a "miserable background" as his mother was a drug dealer and his father did not acknowledge him, many individuals with similar backgrounds do not murder police officers. Petitioner, however, made a voluntary decision to associate with a gang and to use a firearm on three separate occasions.

¶ 25    The court determined that petitioner had a "zero percent chance of successfully rehabilitating himself. This defendant has volitionally chosen a life of misdeed and crime rather

than a life of useful citizenship." The court further stated that "for all of the social disadvantages, for all of the intellectual deficits, this defendant chose to align himself with a gang *** and he chose to take the life of one of the members of the thin blue line." The court found the statutory mitigating factor existed that the murder was committed while petitioner was under the influence of extreme mental or emotional disturbance and declined to sentence petitioner to death. Instead, the trial court sentenced petitioner to life without parole for murder and 30 years for attempted murder to be served in the IDOC.[2]

¶ 26    Petitioner appealed his conviction, arguing the State failed to prove he was guilty beyond a reasonable doubt. Petitioner's conviction was affirmed. *People v. Guye*, 278 Ill. App. 3d 1133 (table) (1996) (unpublished order under Supreme Court Rule 23). Petitioner filed his first postconviction petition in 1998, alleging (1) ineffective assistance of trial counsel, (2) ineffective assistance of appellate counsel, (3) the State knowingly introduced perjured testimony, and (4) he was not proven guilty beyond a reasonable doubt. The trial court dismissed the petition at the first stage.

¶ 27    In 2001, petitioner filed a motion for leave to file a successive postconviction petition arguing that pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), his sentence was unconstitutionally enhanced beyond the statutory maximum based on facts that were not submitted to the jury and proven beyond a reasonable doubt, namely that he knew the victim was a peace officer. The trial court denied petitioner's motion, finding *Apprendi* did not apply retroactively.

¶ 28    Petitioner subsequently sought and was granted leave to file late notices of appeal for the denial of his initial and successive postconviction petitions. The appellate court found it lacked

---

[2] The conviction for aggravated battery with a firearm was merged with the attempted murder count.

jurisdiction to hear petitioner's untimely appeal from the dismissal of his initial postconviction petition. *People v. Guye*, 353 Ill. App. 3d 1090 (table) (2004) (unpublished order under Supreme Court Rule 23). In addition, the court affirmed the trial court's denial of petitioner's motion for leave to file a successive postconviction petition, finding *Apprendi* was not implicated and, regardless, it did not apply retroactively. *Id.*

¶ 29 Petitioner subsequently filed a *habeas corpus* petition in federal court, which was dismissed in 2003. The Seventh Circuit affirmed the dismissal.[3]

¶ 30 In 2016, petitioner filed a second successive postconviction petition, the subject of this appeal. He asserted that the appellate court in *People v. House*, 2015 IL App (1st) 110580, ¶¶ 95-101, extended the Supreme Court's holding in *Miller v. Alabama*, 567 U.S. 460, 489 (2012), and ruled that trial courts must give young adults the same considerations as juveniles before imposing life sentences. Petitioner argued *Miller* and *House* applied directly to his case because he (1) was 18 years old at the time of the offense, (2) had a low IQ, (3) was diagnosed as being underdeveloped, and (4) was sentenced to a mandatory life sentence pursuant to section 1005-8-1(a)(1)(c)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 1994)).[4] He asserted his life sentence therefore violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Petitioner supported the instant successive postconviction petition with Dr. Gelbort's testimony from his sentencing hearing. The trial court denied petitioner leave to file the instant successive

---

[3] The *habeas corpus* petition and the federal court orders are not contained in the record.

[4] We note that petitioner was sentenced to a discretionary life sentence pursuant to Ill. Rev. Stat. 1991, ch. 38, ¶ 1005-8-1(1), which states that the sentence for murder "shall not be less than 20 years and not more than 60 years," but "if the court finds *** that any of the aggravating factors listed in subsection (b) of Section 9-1 *** are present, the court *may* sentence the defendant to a term of natural life imprisonment." (Emphasis added.) Here, the trial court found petitioner knowingly murdered a peace officer who was in the course of performing his official duties, pursuant to Ill. Rev. Stat. 1991, ch. 38., ¶ 9-1(b)(1), and imposed a life sentence rather than the death penalty. Petitioner acknowledges on appeal that his sentence was discretionary.

postconviction petition. This appeal followed.

¶ 31                                ANALYSIS

¶ 32    On appeal, petitioner contends his motion for leave to file the instant successive

postconviction petition was improperly denied and requests that either his sentence be vacated

and the matter remanded for a new sentencing hearing, or that the matter be remanded so he may

file the instant petition. Petitioner maintains his sentence violates the eighth amendment of the

United States Constitution (U.S. Const., amend. VIII) pursuant to *Miller*, and the proportionate

penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) pursuant to *House*,

because the trial court failed to consider his youth and its attendant characteristics prior to

sentencing. See *Miller*, 567 U.S. at 489; *House*, 2015 IL App (1st) 110580, ¶¶ 95-101. He

further argues, for the first time, that pursuant to *People v. Coty*, 2018 IL App (1st) 162383,

¶¶ 75-77, he is intellectually disabled and the trial court was therefore required to consider the

characteristics that accompany his disability before imposing a life sentence. For the reasons

discussed below, we affirm.

¶ 33    The Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides criminal defendants a remedy

to address substantial violations of their federal or state constitutional rights in their original trial

or sentencing hearing. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). The Act

contemplates the filing of only one postconviction petition without leave of court (725 ILCS

5/122-1(f) (West 2016)), and any claim not presented in an original or amended petition is

waived (725 ILCS 5/122-3 (West 2016)). One basis for relaxing the bar against successive

postconviction petitions is where a petitioner can establish cause and prejudice for the failure to

raise the claim earlier. 725 ILCS 5/122-1(f) (West 2016); *People v. Tidwell*, 236 Ill. 2d 150, 157

(2010). "Cause" refers to an objective factor external to the defense that impeded petitioner's

efforts to raise his claim in the initial postconviction proceeding. 725 ILCS 5/122-1(f) (West 2016); *Pitsonbarger*, 205 Ill. 2d at 462. "Prejudice" refers to a claim that "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2016); *Pitsonbarger*, 205 Ill. 2d at 464.

¶ 34    Petitioner must establish both cause and prejudice in order to prevail. *People v. Guerrero*, 2012 IL 112020, ¶ 15. Moreover, claims not raised in the successive postconviction petition are generally forfeited and may not be raised for the first time on appeal. *People v. Johnson*, 2018 IL App (1st) 153266, ¶ 27; *People v. Merriweather*, 2017 IL App (4th) 150407, ¶¶ 14-19. We review the denial of leave to file a successive postconviction petition *de novo*. *People v. Terry*, 2016 IL App (1st) 140555, ¶ 28. Under *de novo* review, we perform the same analysis that the trial court would perform. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151.

¶ 35    We initially address petitioner's contention that the trial court failed to consider his alleged intellectual disability prior to imposing a life sentence as required by *Coty*. *Coty*, 2018 IL App (1st) 162383, ¶¶ 75-77. Although petitioner fails to argue cause for failing to raise the claim earlier, it is apparent he could not have done so as *Coty* was decided two years after the instant successive petition was filed. However, petitioner raises the issue for the first time on appeal rather than in a subsequent successive postconviction petition and thus his claim pursuant to *Coty* is forfeited. See *People v. Jones*, 211 Ill. 2d 140, 148-50 (2004) (claims raised for the first time on appeal are forfeited but may be raised in a successive postconviction petition); *Johnson*, 2018 IL App (1st) 153266, ¶ 27; *Merriweather*, 2017 IL App (4th) 150407, ¶¶ 14-19; see also *People v. Anderson*, 375 Ill. App. 3d 121, 139-40 (2007) (noting that there is no limit to the number of successive postconviction petitions that can be filed in the trial court). Nevertheless, forfeiture is an admonition to the parties and not a limitation on this court. *People*

*v. McCarty*, 223 Ill. 2d 109, 142 (2006). We therefore address the merits of petitioner's claim, and for the following reasons, we find his argument meritless.

¶ 36    The court in *Coty* provided additional protections to intellectually disabled offenders. *Coty*, 2018 IL App (1st) 162383, ¶¶ 69-77.[5] The court based its conclusion on our Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 316-21 (2002), which noted that mildly intellectually disabled individuals have an IQ score below 70. *Id*. at 308 n.3. Our review of the record in this case reveals that petitioner is not intellectually disabled. According to Dr. Gelbort's report and Dr. Messina's report, petitioner's lowest IQ score, which represented only a portion of petitioner's cognitive or intellectual functioning, was 75—five points above the threshold relied on in *Atkins*. See *id*. The remainder of petitioner's IQ scores were well above that threshold. Moreover, neither Dr. Gelbort nor Dr. Messina indicated petitioner was intellectually disabled. Accordingly, petitioner has failed to demonstrate prejudice regarding his constitutional challenge based on an alleged intellectual disability. See 725 ILCS 5/122-1(f) (West 2016); *Pitsonbarger*, 205 Ill. 2d at 464.

¶ 37    Petitioner next contends he has established cause for failing to challenge his sentence pursuant to *Miller* and *House* in a prior proceeding because *Miller* and *House* had not yet been decided. We agree. Our supreme court has determined that *Miller*'s new substantive rule constitutes cause where it was not available earlier. *People v. Davis*, 2014 IL 115595, ¶ 42. We therefore turn to consider whether the trial court erred in determining petitioner failed to demonstrate prejudice. See *Guerrero*, 2012 IL 112020, ¶ 15.

¶ 38    Petitioner maintains he established prejudice because the trial court failed to take into account his youth and its attendant characteristics before imposing a life sentence in violation of

---

[5] To be clear, the court in *Coty* stated that it used the preferred nomenclature "intellectually disabled" rather than the term "mentally retarded." *Id*. ¶ 1 n.1. We will employ the same terminology here.

the federal and state constitutions. Petitioner relies on United States Supreme Court decisions holding that the eighth amendment protects juvenile offenders from capital punishment and mandatory life imprisonment without the possibility of parole. *Miller*, 567 U.S. at 489; *Graham v. Florida*, 560 U.S. 48, 82 (2010); *Roper v. Simmons*, 543 U.S. 551, 578 (2005). He further argues that our appellate court extended these protections to young adults in *People v. Williams*, 2018 IL App (1st) 151373, ¶¶ 19-23, *People v. Harris*, 2016 IL App (1st) 141744, ¶ 67-69, and *House*, 2015 IL App (1st) 110580, ¶¶ 95-101.

¶ 39    In response, the State contends the protections established in *Miller* pursuant to the eighth amendment apply only to juveniles (see *Miller*, 567 U.S. at 489; *People v. Harris*, 2018 IL 121932, ¶ 61), and the proportionate penalties analysis extending *Miller* to young adults applies only to mandatory life or *de facto* life sentences (see *People v. House*, 2019 IL App (1st) 110580-B, ¶¶ 63-65). The State additionally argues that, regardless, petitioner's sentence complies with *Miller* because the trial court considered petitioner's youth and its attendant characteristics prior to imposing a life sentence. See *Miller*, 567 U.S. at 477-78. For the reasons discussed in more detail below, we find (1) petitioner's life sentence does not violate the eighth amendment as he was an adult at the time of the offense, and (2) petitioner's sentence does not violate the proportionate penalties clause because the trial court properly considered the factors set forth in *Miller* (see *id.*).

¶ 40    We begin by addressing petitioner's eighth amendment claim. The eighth amendment prohibits "cruel and unusual punishment." U.S. Const., amend. VIII. Inherent in that prohibition is the concept of proportionality. See *Graham*, 560 U.S. at 59. In applying this rule, the Supreme Court in *Roper* held the eighth amendment prohibits capital sentences for juveniles. *Roper*, 543 U.S. at 578. The Supreme Court subsequently determined in *Graham* that the eighth

amendment prohibits mandatory life without parole sentences for juveniles who commit nonhomicide offenses, and in *Miller* the Court ruled the eighth amendment prohibits mandatory life without parole sentences for juveniles who commit murder. *Graham*, 560 U.S. at 82; *Miller*, 567 U.S. at 489.

¶ 41    The Court's holdings were grounded in its concern, based on scientific research about adolescent brain development, that juveniles lack maturity, are more vulnerable to negative influences, and are more amenable to rehabilitation. *Roper*, 543 U.S. at 569-70. The Court, however, drew a line between juveniles and adults at the age of 18 years. *Id*. at 574; see also *Miller*, 567 U.S. at 465; *Graham*, 560 U.S. at 74-75; *Harris*, 2018 IL 121932, ¶¶ 56, 60-61. While the Court acknowledged that the line was an imprecise "categorical rule," it nonetheless stated that "a line must be drawn." *Roper*, 543 U.S. at 574. As petitioner was 18 years old at the time of the offense, he falls on the adult side of that line and presented no evidence as to why he should be an exception to the rule expressed in *Miller*. See *Miller*, 567 U.S. at 489. Accordingly, petitioner's eighth amendment challenge necessarily fails. See *id*; *Harris*, 2018 IL 121932, ¶¶ 56, 60-61. Petitioner has therefore failed to demonstrate prejudice with respect to his eighth amendment claim. 725 ILCS 5/122-1(f) (West 2016); *Pitsonbarger*, 205 Ill. 2d at 464.

¶ 42    Petitioner next contends that *Williams*, *Harris*, and *House* extended the reasoning in *Miller* to young adults challenging their life sentences pursuant to the proportionate penalties clause of the Illinois Constitution. See *Williams*, 2018 IL App (1st) 151373, ¶ 19-23; *Harris*, 2016 IL App (1st) 141744, ¶ 67-69; *House*, 2015 IL App (1st) 110580, ¶ 95-101. After petitioner filed his opening brief, however, the appellate court's holding in *Harris* was reversed by our supreme court, and the appellate court was directed to vacate its judgments in *Williams* and *House* and consider the effect of *Harris*. *Harris*, 2018 IL 121932; *People v. Williams*, No.

123694 (Ill. Nov. 28, 2018) (supervisory order); *People v. House*, No. 122134 (Ill. Nov. 28, 2018) (supervisory order).[6] Our supreme court in *Harris* determined that because the 18-year-old defendant failed to raise his as-applied challenge in the trial court, an evidentiary hearing was not held, and the trial court did not make the necessary findings of fact regarding the defendant's specific circumstances. *Harris*, 2018 IL 121932, ¶ 40. Accordingly, the record did not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis of the *Miller* decision applied to the defendant's specific facts and circumstances. *Id*. ¶ 46. The defendant's claim was therefore premature, and was more appropriate for a postconviction proceeding (725 ILCS 5/122-1 *et seq*. (West 2016)) or a petition seeking relief from a final judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). *Id*. ¶ 48. Thus, the court left open the possibility that an adult defendant could present evidence demonstrating *Miller* applies to his particular circumstances in a challenge pursuant to the proportionate penalties clause. *Harris*, 2018 IL 121932, ¶¶ 45-48.

¶ 43     In addition, our supreme court in *People v. Holman*, 2017 IL 120655, ¶ 40, held that the rationale of *Miller* applies to discretionary sentences of life without parole for juvenile defendants. In that case, the defendant received a discretionary sentence of life without parole for a murder that he committed at age 17. *Id*. ¶ 1. Upon the denial of leave to file his successive postconviction petition, the defendant maintained that his sentence was unconstitutional under *Miller* and its progeny because the trial court did not apply the factors presented in *Miller* regarding his youth and its attendant characteristics. *Id*. ¶¶ 20-22. Although our supreme court ultimately affirmed the dismissal of the defendant's successive postconviction petition, in doing

---

[6] The court in *House* subsequently reaffirmed its finding that the 19-year-old defendant's mandatory life sentence violated the proportionate penalties clause. *House*, 2019 IL App (1st) 110580-B, ¶¶ 64-65. We will discuss *House* in more detail below.

so it set forth the framework with which we are to evaluate whether or not a juvenile defendant's discretionary sentence of life without parole passes constitutional muster:

"Under *Miller* and *Montgomery* [*v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016)], a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

Furthermore, according to *Holman*, a key feature of the juvenile's sentencing hearing is that the defendant had the "opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility. *Id*. ¶ 49 (citing *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736). The *Holman* court went on to expressly consider situations where a defendant was sentenced prior to *Miller* and observed that, "[i]n revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing." *Id*. ¶ 47. The court further noted that

whether evidence of a defendant's youth and its attendant circumstances exists "depends upon the state of the record in each case." *Id*. Accordingly, "[a] court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id*.

¶ 44 Here, we acknowledge that the trial court did not have the benefit of the *Harris* decision and therefore did not hold an evidentiary hearing to determine whether *Miller* applies to petitioner's particular circumstances as an 18-year-old adult. See *Harris*, 2018 IL 121932, ¶¶ 40, 45-48. Nevertheless, as in *Holman*, the record here is sufficient to review petitioner's claim that the sentencing court failed to consider the *Miller* factors prior to imposing a life sentence. See *Holman*, 2017 IL 120655, ¶¶ 47-50.

¶ 45 In reviewing petitioner's claim, we find the facts of *Holman* instructive. See *id*. ¶¶ 48-50. In that case, our supreme court determined the defendant's sentence complied with *Miller*, even where *Miller* was decided after the sentencing hearing. *Id*. ¶¶ 6, 47-50. In reaching this conclusion, our supreme court relied on the following facts. The trial court explicitly stated that it considered the trial evidence, the PSI, and evidence and arguments from the sentencing hearing. *Id*. ¶ 48. The trial court knew the defendant's age at the time of the offense, and the parties highlighted his age during the sentencing hearing. *Id*. The PSI and psychological reports provided some insight into the defendant's mentality, but they did not depict him as immature, impetuous, or unaware of risks. *Id*. The PSI included information about the defendant's family, including that his father and stepfather had died, and he maintained a close relationship with his mother and siblings. *Id*. Although there was some dispute as to whether the defendant or his accomplice shot the victim, both were "intimately involved" with the offense. *Id*. The trial court was informed of the defendant's susceptibility to peer pressure, as well as his low intelligence

and possible brain damage from a head injury, but no evidence indicated the defendant was incompetent and could not communicate with police officers or prosecutors or assist his own attorney. *Id*. Moreover, a psychiatrist who treated the defendant spoke highly of his verbal intelligence. *Id*.

¶ 46 As for the *Holman* defendant's prospects for rehabilitation, the PSI included a statement from the defendant's probation officer, who found " 'no predilection for rehabilitation,' " in light of the defendant's " 'history of senseless criminal acts of mortal violence toward others and lack of remorse for his victims.' " *Id*. The defendant was provided an opportunity to present evidence demonstrating his criminal conduct was the product of immaturity and not incorrigibility but chose to offer nothing. *Id*. ¶ 49. The defendant declined to present evidence related to any of the statutory factors in mitigation, but the trial court heard the aforementioned evidence related to the *Miller* factors. *Id*. ¶ 50. In addition, there was significant evidence related to the statutory factors in aggravation, including the defendant's convictions for his involvement in two unrelated murders. *Id*. ¶¶ 13, 50. The trial court explicitly made a finding of permanent incorrigibility prior to sentencing the defendant to life without parole, stating " 'the Court believes that this Defendant cannot be rehabilitated, and that it is important that society be protected from this Defendant.' " *Id*. ¶¶ 17, 50. Based on this evidence, our supreme court found the defendant's sentence passed constitutional muster under *Miller*. *Id*. ¶¶ 48-50.

¶ 47 After reviewing the record in this case, we find the evidence presented by the parties and considered by the trial court is comparable to the evidence introduced and considered in *Holman*. See *id*. The trial court considered evidence of petitioner's youth and its attendant characteristics at the time of sentencing and petitioner had the "opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility." See *id*. ¶ 49. With

respect to the first *Miller* factor—petitioner's age at the time of the offense and any evidence of immaturity, impetuosity and failure to appreciate risks and consequences—when imposing petitioner's sentence the trial court explicitly stated that it listened to and considered the evidence in mitigation. The trial court knew defendant's age at the time of the offense, and the parties highlighted his age during the sentencing hearing. Moreover, Dr. Gelbort provided detailed testimony into petitioner's mentality, including testimony that petitioner had "difficulty with impulsivity, *** with judgment, with reasoning, with the ability to appreciate the ramifications of one's own behavior." He further testified, however, that while there was evidence of organic brain dysfunction, there could also be personality attributes resulting in petitioner's behavior. In addition, Dr. Gelbort testified petitioner could conform his behavior to acceptable norms of conduct and could appreciate the criminality of his actions. Furthermore, unlike the characteristics attributable to juveniles, there was no indication petitioner's condition was transient.

¶ 48　As to the second *Miller* factor—petitioner's family and home environment—petitioner's family background was outlined in his PSI, testified to by his mother, Shirley, and argued by defense counsel. The trial court was informed that Shirley sold drugs in front of petitioner in order to support her family and that petitioner's father did not acknowledge petitioner as his son. In addition, Shirley testified that two and a half years prior to the instant offense, petitioner accidentally shot and killed his cousin, with whom he was "best friends." Shirley stated the incident caused petitioner to distance himself from everyone and "from reality." Petitioner's PSI indicated he got along well with his mother and three siblings, although his younger brother was in prison. The trial court was also informed of petitioner's six children and found petitioner's statement that he enjoyed playing with them was a mitigating factor. The trial court explicitly

acknowledged petitioner's background, stating that it was "miserable" as "[h]is mother was a drug dealer, his father didn't acknowledge him." The court further stated, however, that "there are many people with similar backgrounds who don't go out and murder policemen."

¶ 49     With respect to the third *Miller* factor—petitioner's degree of participation in the homicide and any evidence of familial or peer pressure—the trial court was aware of the facts of the case as the same judge presided over petitioner's trial and sentencing hearing. The State noted during its argument in aggravation that petitioner was directly responsible for the offense. Moreover, no evidence was presented indicating petitioner was susceptible to peer pressure. In fact, the record reveals that petitioner voluntarily promised to attack an officer and willingly followed through with his promise. There was no indication he was coerced, pressured, or participated out of fear.

¶ 50     As to the fourth factor—petitioner's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys—the trial court was informed of petitioner's low intelligence (associated with only one half of his brain) and possible brain damage from a head injury, but no evidence indicated petitioner was incompetent and could not communicate with police officers or prosecutors or assist his own attorney. Moreover, Dr. Gelbort testified the right hemisphere of petitioner's brain, *i.e.*, his visual memory, was actually above average. The court specifically found petitioner's intellectual deficit was a mitigating factor such that it precluded the imposition of the death penalty.

¶ 51     Finally, with respect to the fifth factor—petitioner's prospects for rehabilitation—the trial court explicitly acknowledged that it was directed "to consider what are the prospects pursuant to our constitution that this person can be restored to useful citizenship, what are his chances for rehabilitation." The trial court recounted petitioner's significant criminal history and specifically

acknowledged his social disadvantages and intellectual deficits, but ultimately concluded that petitioner was permanently incorrigible, stating "[t]his defendant has zero chance of successfully rehabilitating himself."

¶ 52     The record therefore demonstrates that, as in *Holman*, (1) the trial court was aware of petitioner's age, (2) psychological reports provided insight into petitioner's mentality, (3) the trial court received detailed information regarding petitioner's family and background, (4) the trial court knew petitioner was intimately involved in the offense, (5) the trial court learned of petitioner's low intelligence and possible brain damage from a head injury, (6) a psychologist or psychiatrist spoke positively about petitioner's intelligence as it related to one aspect of petitioner's intellectual functioning, and (7) the trial court made an explicit finding of permanent incorrigibility.  See *id*. ¶¶ 48, 50.  We thus conclude that the evidence discussed above was the type that *Miller* requires trial courts to consider in a juvenile sentencing hearing.  See *id*. ¶¶ 46-50.  Moreover, as in *Holman*, petitioner was provided the opportunity to present evidence that his crimes were the product of immaturity and not incorrigibility—including evidence regarding his age, education, psychological abnormalities, and family history—and the trial court considered that evidence.  See *id*. ¶ 49.

¶ 53     We acknowledge that a different sentencing court could have reached a different sentence based on the evidence presented at petitioner's sentencing hearing.  Nevertheless, "nothing in *Miller* or *Holman* suggests that we are free to substitute our judgment for that of the sentencing court.  Our role is to evaluate the sentencing hearing to ensure that a juvenile defendant had the opportunity to present evidence related to the hallmarks of youth and that the trial court considered the defendant's youth and its attendant characteristics." *People v. Croft*, 2018 IL App (1st) 150043, ¶ 33.  Based on the record before us, we cannot say that petitioner's sentencing

hearing was constitutionally defective pursuant to the proportionate penalties clause. See *Harris*, 2018 IL 121932, ¶¶ 45-48; *Holman*, 2017 IL 120655, ¶¶ 46-50. Accordingly, petitioner has failed to demonstrate prejudice. 725 ILCS 5/122-1(f) (West 2016); *Pitsonbarger*, 205 Ill. 2d at 464. We therefore affirm the trial court's denial of petitioner's motion for leave to file his second successive postconviction petition.

¶ 54    In reaching this conclusion, we acknowledge that on remand, the appellate court in *House* reaffirmed its finding that the 19-year-old defendant's mandatory life sentence violated the proportionate penalties clause. *House*, 2019 IL App (1st) 110580-B, ¶¶ 64-65. The court made clear, however, that its conclusion was based on the fact that the trial court was precluded from considering any mitigating factors presented by the defendant before imposing a mandatory life sentence. *Id*. ¶¶ 63-65. In contrast, the trial court in this case considered a plethora of evidence regarding mitigating factors prior to imposing a discretionary sentence. Moreover, the defendant in *House* was convicted under a theory of accountability—a significant mitigating factor—as he was merely a lookout during the offense and was not the actual shooter. *Id*. ¶¶ 46, 64. Here, unlike the defendant in *House*, petitioner was directly responsible for the offense. See *id*. Accordingly, the concerns raised by the court in *House* are not implicated here. See *id*. ¶¶ 63-65.

¶ 55                                          CONCLUSION

¶ 56    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 57    Affirmed.