# Illinois Official Reports

## Appellate Court

*People v. Croft*, 2018 IL App (1st) 150043

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CURTIS CROFT, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-15-0043 |
| Filed | February 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 86-CR-9932(02); the Hon. Lawrence E. Flood, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Manuel S. Serritos, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People. |
| Panel | PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.<br>Justices Harris and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant Curtis Croft appeals from the second-stage dismissal of his successive petition for postconviction relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)). His petition asserted that his discretionary sentence of natural life in prison without parole was imposed without consideration of the factors cited in *Miller v. Alabama*, 567 U.S. 460 (2012). The circuit court concluded that defendant's claims were barred by *res judicata* in light of our opinion in *People v. Croft*, 2013 IL App (1st) 121473, in which we rejected defendant's first *Miller* challenge to his discretionary life sentence. The circuit court therefore dismissed defendant's successive petition.

¶ 2 On appeal, defendant contends that the law has changed since our previous opinion and that *res judicata* does not apply. He further argues that he is entitled to a new sentencing hearing at which the sentencing court can consider the "hallmark features" of youth. The State concedes that *res judicata* does not bar defendant's *Miller* claim but argues that defendant is not entitled to a new sentencing hearing because the circuit court considered defendant's youth as well as defendant's role in the offense in reaching its discretionary sentence. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                     BACKGROUND

¶ 4 At the age of 17, defendant participated in the gang rape, kidnapping, and murder of 16-year-old Kim Boyd. An autopsy revealed that Boyd had been stabbed over 40 times in the head, face, neck, hands, abdomen, back, and buttocks. She had bruises on her face, elbow, and back, along with a broken thigh bone and several fractured ribs. She further sustained injuries consistent with coming into contact with the underside of a car. The cause of death was attributed to the stab wounds.

¶ 5 A thorough recitation of the facts can be found in our opinion affirming defendant's convictions. *People v. Croft*, 211 Ill. App. 3d 496 (1991). We set forth here only those facts necessary to understand our disposition. Defendant waived his right to a jury trial. The testimony at trial showed that a number of people, including defendant and Boyd, were drinking at defendant's home in the early morning of July 13, 1986. There was testimony that Demetrius Henderson struck Boyd and forced her to have sexual intercourse with him. While Henderson was having sex with Boyd, defendant forced Boyd to perform oral sex on him. Henderson and defendant then forced Kevin Campbell and Alonzo Woodard to have sex with Boyd. After the sexual assault, Boyd was blindfolded and placed in the trunk of Henderson's car.

¶ 6 Detective Lawrence Tuider testified that he interviewed defendant and that defendant denied having sex with Boyd. Defendant told Tuider that he acted as the lookout while Boyd was taken to the car, and that he was a passenger when Henderson drove off with Boyd in the trunk. Defendant claimed to have told Henderson that they should feed Boyd and let her go home but Henderson refused. They drove to an alley where they removed Boyd from the trunk and got back in the car. Defendant was a passenger when Henderson ran Boyd over with the car five times. Henderson got out of the car and stabbed Boyd repeatedly, he returned to the car, and the two then drove back to defendant's home and went to sleep.

¶ 7 Assistant State's Attorney (ASA) Bernard Murray testified that he interviewed defendant, who stated that Henderson struck Boyd and forced her to have sex with him, and then Woodard had sex with her. Henderson stated that they would either have to kill Boyd or that she would go to the police, but defendant did not agree. Defendant said that Henderson blindfolded Boyd and put her in the trunk of his car. Defendant claimed to have said they should feed Boyd and take her home, but Henderson refused. Defendant got in Henderson's car and the two drove to an alley. Defendant claimed to have stayed in the car while Henderson took Boyd out of the trunk, ran over her with the car four to five times, and then stabbed her repeatedly. Henderson then drove back to defendant's home.

¶ 8 Defendant testified that he did not have sexual intercourse with Boyd but was present in the room while the others did. He testified that at about 4 a.m., he was in the car with Henderson and Boyd. He denied that Boyd was blindfolded or in the trunk of the car. They stopped at defendant's girlfriend's house, and defendant knocked on her door but there was no answer. When he tried to return to the car, Henderson had driven away. Defendant stated that he told police and ASA Murray this sequence of events and denied making any statements inconsistent with his trial testimony.

¶ 9 The circuit court found defendant guilty of murder, aggravated kidnapping, and aggravated criminal sexual assault. The trial judge, Judge Richard E. Neville, sentenced defendant to life in prison for murder, 45 years for aggravated criminal sexual assault, and 10 years for aggravated kidnapping, with the sentences to run concurrently. On direct appeal, defendant did not challenge his convictions but instead argued that the circuit court improperly relied on his codefendants' statements during sentencing. We affirmed defendant's convictions but remanded for resentencing before a different judge. *Croft*, 211 Ill. App. 3d 496. On remand, circuit court Judge James N. Schreier presided over the resentencing hearing held on May 7, 1992. The circuit court heard mitigation testimony from defendant's father, grandfather, grandmother, and girlfriend with whom he had a child, as well as from Reverend Gordon McLean, a minister of 43 years who had actively counseled prisoners who might be released. The circuit court also considered defendant's high school records from Statesville, a letter from a teacher from the university that taught at Statesville, defendant's statement in allocution, and arguments from counsel in aggravation and mitigation. At the end of the hearing, Judge Schreier stated:

" 'The defendant talks about mistake in judgment. This is not a case of passive presence, negative acquiescence, mistaken judgment, none [*sic*] participation. It is not a situation of not using good judgment to associate with certain people, in effect then being in the wrong place at the wrong time.

This is a case of the defendant's participation in the series of events which properly resulted in guilty findings as to murder and aggravated kidnapping and aggravated criminal sexual assault.

The evidence in this case seems to me to be about a person who was really cold hearted, almost inhuman in his participation in this brutal, heinous, evil doing. One of the most brutal crimes I have ever seen in all the years I've spent in this building.

About 40 stab wounds, gang rape, driving over this young girl in a car, after having her in the trunk. One can almost not imagine any worst [*sic*] facts. Nightmarish is almost too weak a word. It staggers the imagination.

And this defendant cannot simply say, gee, I'm terribly sorry this all happened.

There is [*sic*] certain crimes that there are no second chances. There are [*sic*] no one free bite. There are no forgivenesses, saying I'm sorry, expressing regret. Even if I were to consider the defendant's words about mistake in judgment to be equivalent, are [*sic*] not good enough.

There was a participation in one of the brutal [*sic*] crimes that I've heard about. And for that a great penalty must be paid. The victim cannot be brought back and the family's tragedy, which the defendant alluded to in his remarks cannot be allayed. I [*sic*] simply saying, well, I'm sorry it happened. I'm sorry, I was there or legally participated.

So, considering the presentence report, considering the arguments and testimony and evidence at this sentencing hearing, considering the factors set forth in the statute, considering the crime and the criminal, the crime being about as heinous a murder as one can imagine, and by a person who because of the nature of the crime, one can only determine to have evil intentions and to be absolutely heartless, merciless and heartless during the killing and torture of this young girl.

All things considered, the sentence of the Court will be a reiteration of Judge Neville's sentence, that is natural life without parole on the murder, 45 years for aggravated criminal sexual assault, and 10 years for aggravated kidnapping, concurrent.' " *Croft*, 2013 IL App (1st) 121473, ¶ 3.

Defendant appealed the circuit court's resentencing order. We reduced defendant's sentence for aggravated criminal sexual assault to 30 years' imprisonment, but otherwise affirmed. *Id.*; *People v. Croft*, No. 1-92-2163 (1994) (unpublished order under Illinois Supreme Court Rule 23).

¶ 10      Defendant then filed a *pro se* postconviction petition, asserting ineffective assistance of trial and appellate counsel. The circuit court summarily dismissed his petition. We initially affirmed the circuit court's dismissal, finding that the petition was untimely. *People v. Croft*, No. 1-99-1606 (2001) (unpublished order under Illinois Supreme Court Rule 23). Following a supervisory order from our supreme court (*People v. Croft*, 205 Ill. 2d 600 (2003) (supervisory order)), we remanded to the circuit court for further proceedings (*People v. Croft*, No. 1-99-1606 (2004) (unpublished order under Illinois Supreme Court Rule 23)). Defendant then filed a *pro se* amended postconviction petition, asserting that his life sentence was unconstitutional under *Roper v. Simmons*, 543 U.S. 551 (2002). The State moved to dismiss defendant's amended petition. The circuit court appointed counsel to represent defendant, and on March 22, 2012, the circuit court dismissed the amended petition as untimely.

¶ 11      On appeal, defendant argued that his natural life sentence violated *Miller*, 567 U.S. 460. We rejected his argument, finding that *Miller* did not apply to discretionary life sentences for juvenile offenders. *Croft*, 2013 IL App (1st) 121473, ¶ 8. We also observed that:

"At defendant's sentencing hearing, moreover, the trial court expressly considered defendant's presentence investigation report, which included his age, as well as 'the crime and the criminal.' *People v. Partin*, 156 Ill. App. 3d 365, 373 (1987) (trial court is presumed to have considered any evidence of mitigation before it). Ultimately, however, the [trial] court found the murder of which defendant was convicted to be 'brutal' and 'as heinous a murder as one can imagine,' and, on that basis, rejected a term of years in favor of a sentence of natural life imprisonment. This court rejected defendant's claim on direct appeal that his sentence was excessive. *Croft*, No.

1-92-2163. Contrary to defendant's claim, there is simply no basis for applying *Miller* in this case. Defendant not only received a discretionary life sentence, but his youth was also a mitigating factor considered by the court in its sentencing determination. *Miller*, 567 U.S. at [465, 483] ***." *Croft*, 2013 IL App (1st) 121473, ¶ 14.

¶ 12    On October 3, 2012, defendant filed a *pro se* motion for leave to file a successive postconviction petition. He again challenged his sentence under *Miller*. The circuit court appointed counsel to represent defendant, and counsel filed a supplemental postconviction petition. On December 12, 2014, the circuit court, on the State's motion, found that defendant's *Miller* claim was barred by *res judicata* in light of *Croft*, 2013 IL App (1st) 121473, and dismissed the petition.

¶ 13    Defendant filed a timely notice of appeal. After this matter was fully briefed in this court, the supreme court filed its opinion in *People v. Holman*, 2017 IL 120655. We ordered the parties to file supplemental briefs addressing the effect of *Holman* on the case before us.

¶ 14                                ANALYSIS

¶ 15    Defendant's first argument is that *res judicata* does not bar his successive postconviction petition because the law has changed since we first rejected his *Miller* claim. In its supplemental response brief, the State agrees that recent case law "overrides the *res judicata* bar to [defendant's] eighth amendment claim and that *Holman* extended the rule of [*Miller*] to discretionary life sentences." We also agree and conclude that defendant's *Miller* claim is not barred by *res judicata* due to intervening changes in the law since our previous disposition.

¶ 16    The doctrine of *res judicata* provides that when a court of competent jurisdiction renders a final judgment on the merits of a claim, the court's judgment is conclusive of the rights of the parties and operates as a bar to future litigation of the same claim. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389 (2001). *Res judicata* may be relaxed, however, when the law has changed from a previous appeal. *People v. Sanders*, 393 Ill. App. 3d 152 (2009). A brief review of the controlling precedent shows that the law has evolved since we filed our opinion in *Croft*, 2013 IL App (1st) 121473.

¶ 17    In *Miller*, the Supreme Court expanded on cases involving juvenile offenders that stand for the proposition that the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Miller*, 567 U.S. at 473-74 (discussing *Roper*, 543 U.S 551, and *Graham v. Florida*, 560 U.S. 48 (2010)). The Court explained that sentencing schemes imposing mandatory life sentences on juvenile offenders violate the eighth amendment. *Miller*, 567 U.S. at 479. *Miller* holds that before a state may impose a life sentence on a juvenile offender, the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 18    Our supreme court subsequently found that *Miller* declared a new substantive rule and therefore applied retroactively to cases on collateral review. *People v. Davis*, 2014 IL 115595, ¶ 39. Our supreme court's holding in *Davis* is consistent with the Supreme Court's finding in *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734-36 (2016), that "*Miller* announced a substantive rule of constitutional law" that applies retroactively.

¶ 19    In *People v. Reyes*, 2016 IL 119271, ¶ 9, our supreme court observed that, "A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a

juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison." The court concluded that "a legislatively mandated sentence of 97 years, with the earliest opportunity for release after 89 years" imposed on a 16-year-old offender amounted to an unconstitutional *de facto* life sentence under *Miller. Id.* ¶ 10. Finally, in *Holman*, our supreme court held that "*Miller* applies to discretionary sentences of life without parole for juvenile defendants." 2017 IL 120655, ¶ 40.

¶ 20       As the foregoing cases make clear, a juvenile offender may raise a *Miller* claim to either a life sentence or a term-of-years sentence that amounts to a *de facto* life sentence, whether the circuit court imposed the sentence pursuant to a mandatory sentencing scheme or a discretionary sentencing scheme. The portion of our prior opinion in which we held that *Miller* did not apply to discretionary life sentences is no longer correct. As noted above, a change in law is an exception to the application of *res judicata*. We agree with the parties that, due to intervening changes in the law, our opinion in *Croft*, 2013 IL App (1st) 121473, does not bar defendant's successive postconviction petition asserting a *Miller* claim, and we conclude, therefore, that our prior decision cannot stand as a procedural barrier to defendant asserting his *Miller* claim to the circuit court's imposition of a discretionary life sentence.

¶ 21       Furthermore, in our previous opinion, we concluded that the circuit court did consider defendant's youth as a mitigating factor at sentencing. But in *Holman*, our supreme court expressly adopted a framework for evaluating whether a sentencing court's imposition of a life sentence on a juvenile offender complied with *Miller*:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

Our prior opinion did not have the benefit of our supreme court's guidance with respect to evaluating a sentencing hearing for compliance with *Miller*. Therefore, we further conclude that our prior examination of the merits of defendant's *Miller* claim should not be given preclusive effect and that his claim should be considered under the framework our supreme court adopted in *Holman*.

¶ 22       Defendant argues that the sentencing court failed to consider his chronological age; any evidence of immaturity, impetuosity, or failure to appreciate risks and consequences; or his degree of involvement in the crimes. He further contends that the record contains no evidence regarding whether defendant was incompetent or unable to assist in his own defense and that the sentencing court never made any finding of incorrigibility. He argues that he is entitled to a

new sentencing hearing that will comport with *Miller*. We disagree and find that defendant's sentencing hearing complied with *Miller*.

¶ 23    The inquiry into whether a sentencing court complied with *Miller* is backwards-looking. *Id.* ¶ 47.

> "In revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id.*

Furthermore, according to *Holman*, a key feature of the juvenile's sentencing hearing is that the defendant had the "opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility." *Id.* ¶ 49 (citing *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736).

¶ 24    Here, we have examined the cold record of the circuit court's resentencing hearing following remand, which includes the common-law record and report of proceedings, and find that the circuit court considered evidence of the defendant's youth and its attendant characteristics at the time of sentencing and that the defendant had the "opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility." With respect to the first factor identified in *Holman*—defendant's age at the time of the offense and any evidence of immaturity, impetuosity, and a failure to appreciate risks and consequences—when imposing defendant's sentence, the circuit court explicitly stated that it had considered the presentence investigation report (PSI), the arguments and testimony and evidence at the resentencing hearing, the statutory sentencing factors, and "the crime and the criminal." The circuit court knew that defendant was 17 at the time of the offense, as both the State and defendant noted defendant's chronological age at the resentencing hearing. Neither the PSI nor the testimony of defendant's father, grandmother, grandfather, the mother of one of his children, or Reverend McLean depicted defendant as immature, impetuous, or unable to appreciate risks and consequences. Defendant was in his senior year of high school when he was arrested and charged with the offenses at issue. He had previously been employed as a valet parking attendant, an auto alarm installer, and a stockman at a market. Defendant had never seen a psychiatrist or psychologist and, other than suffering from asthma, was physically healthy. He drank a few cans of beer on weekends and denied ever having used drugs. He had a minimal, nonviolent criminal history.

¶ 25    As to the second factor identified in *Holman*, defendant's family and home environment, the PSI noted that defendant was raised by his mother and father with a "normal childhood with average grades in school." At the resentencing hearing, defendant's grandmother, grandfather, father, and the mother of one of his two children testified on defendant's behalf. His grandparents testified that they helped raise defendant while his parents were working, he did "fine" in high school, he had no trouble with the police, and he never showed any violent tendencies. His father was employed at the University of Chicago and was a mechanical engineer. His father agreed that defendant was doing well in school, had little trouble with the police, did not have violent tendencies, had no disciplinary problems while incarcerated, and was involved in his children's lives. Reverend McLean testified that for over 43 years he worked with thousands of young people and that he was involved with defendant from his

arrest until his trial. Reverend McLean described defendant as articulate, sincere, and helpful with other students. Defendant's teachers told Reverend McLean that he had a good attitude, did good work, and talked about joining the Air Force. Reverend McLean opined that defendant was "intelligent and has ability, an attitude of real regret," and believed he could be rehabilitated.

¶ 26     With respect to the third *Holman* factor, the sentencing court was familiar with the facts of the case, stating that it had read our opinion affirming defendant's convictions. At the resentencing hearing, defendant's counsel highlighted that defendant's guilt for Boyd's murder was based on an accountability theory and that Henderson was more culpable for Boyd's death. Defense counsel stated that Henderson "was older, larger, stronger and was armed." Counsel emphasized that defendant tried to dissuade Henderson from killing Boyd and urged the sentencing judge to give defendant "some light at the end of the tunnel, some hope for the future, some hope of some day being released."

¶ 27     Defendant does not, however, identify any evidence presented at trial or at resentencing that might suggest he was coerced or pressured by anyone to participate in any of the offenses or that he participated out of fear. At trial, the State introduced evidence that defendant was present for and voluntarily participated in the sexual assault. There was also testimony from Detective Tuider that defendant stated that he acted as the lookout while Henderson put Boyd in the trunk of his car. Both Tuider and ASA Murray testified that defendant admitted to being a passenger in Henderson's car while they drove to the alley with Boyd in the trunk. According to the trial testimony, defendant gave conflicting statements as to whether he helped Henderson remove Boyd from the trunk and place her in the alley. There was consistent testimony that defendant remained in the car while Henderson repeatedly drove over Boyd and then repeatedly stabbed her to death. The evidence at trial and at resentencing showed that defendant was an active participant in the sexual assault and kidnapping, and the circuit court was well aware that defendant's murder conviction was based on an accountability theory and, therefore, was unquestionably aware of defendant's level of participation in Boyd's death.

¶ 28     As to the fourth factor, defendant's level of competence and ability to deal with police officers or prosecutors and his capacity to assist his attorneys, neither the State nor defendant introduced any evidence tending to show that defendant was incompetent, unable to deal with the police or prosecutors, or incapable of assisting his attorneys. By all accounts, defendant was physically healthy, a good student, and had no known mental health issues.

¶ 29     Finally, with respect to the fifth *Holman* factor, defendant's prospects for rehabilitation, in addition to the testimony from his family members, the resentencing court heard testimony from Reverend McLean regarding defendant's prospects for rehabilitation. Reverend McLean was the director of the Juvenile Justice Ministry for Metro-Chicago Youth for Christ and worked with the youth section of the Cook County jail. He met defendant in the summer of 1986 and had written a book that featured defendant's story. He worked with defendant twice a week while defendant was awaiting trial. He spoke with defendant's teachers in Statesville about defendant's conduct and history while incarcerated and, based on his conversations with defendant and his experience working with young people, Reverend McLean believed that defendant "could make something worthwhile and good of his life." Reverend McLean stated that defendant had expressed sincere remorse for participating in the events culminating in Boyd's death. The resentencing court also heard defendant's statement in allocution in which he expressed his sorrow and condolences to Boyd's family for their loss. Defendant

acknowledged that he exercised "very poor judgment" in the people he associated with. He stated that he was not the man that the original sentencing judge believed him to be, and that he was "a different man than I was [six] years ago." He concluded his statement by saying, "I'm sorry."

¶ 30 The circuit court stated that it considered the statutory factors in aggravation and mitigation and neither the defendant nor the State asserted any argument with respect to any of those factors.

¶ 31 Defendant contends that the circuit court never found that he was incorrigible. He argues that the circuit court acknowledged that he was *not* incorrigible, based on the following statement at resentencing:

> "And the defendant's light at the end of the tunnel will have to, in my judgment[,] rely on some future governor taking a look at his actions and deeds, which speak louder than words in the penal system, after a period of years and then determine whether or not the defendant is deserving of executive clemency, of mercy. That will be the light at the end of the tunnel, as far as I'm concerned. And it is not unrealistic for the defendant."

Judge Schreier's comments, however, must be considered in context. Defense counsel argued that the sentencing court should give defendant "some light at the end of the tunnel, some hope for the future, some hope of some day being released." In explaining his sentence, Judge Schreier stated:

> "So, considering the presentence report, considering the arguments and testimony and evidence at this sentencing hearing, considering the factors set forth in the statute, considering the crime and the criminal, the crime being about as heinous a murder as one can imagine, and by a person who because of the nature of the crime, one can only determine to have evil intentions and to be absolutely heartless, merciless and heartless during the killing and torture of this young girl."

The circuit court's statement is a clear indication that the resentencing judge believed defendant to be incorrigible. The circuit court's statement that "executive clemency, of mercy" was "not unrealistic" is not the same as the circuit court concluding that defendant was capable of being rehabilitated. Rather, considering the statement in context, we consider Judge Schreier's statement to be his conclusion that, based on his consideration of the crime and the criminal, the penalty he imposed was warranted for an offender he found to be "really cold hearted, almost inhuman in his participation in his brutal, heinous, evil doing." Furthermore, the circuit court concluded that defendant's expression of remorse was not credible and that his potential for rehabilitation was not presently evident. At best, the circuit court's comments express uncertainty as to whether defendant could ever be deserving of executive clemency at some remote and unknown time in the future.

¶ 32 We find that the circuit court considered the type of evidence that *Miller* requires for a juvenile sentencing hearing. *Holman* instructs that we review the cold record of the sentencing hearing to determine whether the trial court considered a nonexhaustive list of factors in order to comply with *Miller*, and directs that a defendant facing a sentence of life imprisonment without parole is entitled to a sentencing hearing at which he had the opportunity to present evidence that his crimes were the product of his youth and its attendant characteristics. Here, we find that the *Holman* factors were sufficiently addressed, the defendant presented mitigating evidence that addressed these factors, and the resentencing court considered them.

Based on the record before us, we cannot say that defendant's sentencing hearing was constitutionally defective.

¶ 33 We acknowledge that a different sentencing court could have reached a different sentence based on the evidence presented at defendant's resentencing hearing. But nothing in *Miller* or *Holman* suggests that we are free to substitute our judgment for that of the sentencing court. Our role is to evaluate the sentencing hearing to ensure that a juvenile defendant had the opportunity to present evidence related to the hallmarks of youth and that the circuit court considered the defendant's youth and its attendant characteristics. We find that defendant's resentencing hearing complied with *Miller*, *Holman*, and a contemporary understanding of the eighth amendment.

¶ 34                                              CONCLUSION

¶ 35 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 36 Affirmed.