2020 IL App (1st) 180505-U

FIFTH DIVISION
July 10, 2020

No. 1-18-0505

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 07 CR 12118 |
| | ) | |
| MICHAEL PACE, | ) | |
| | ) | Honorable Matthew E. Coghlan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The defendant's sentence was a *de facto* life sentence that required the circuit court to consider his youth and its attendant circumstances. The court properly considered the defendant's youth and its attendant circumstances in imposing a *de facto* life sentence. In addition, the defendant's 75-year sentence was not excessive. We affirm.

¶ 2     Defendant Michael Pace was charged with first degree murder, attempted murder, and aggravated battery with a firearm stemming from shots he fired while standing in a Chicago Transit Authority (CTA) bus in 2007. 720 ILCS 5/9-a(a)(1), (a)(2); 720 ILCS 5/8-4; 720 5/12-4.2 (West 2006). Defendant was 16 years old at the time of the offense but he was tried as an adult pursuant

to the automatic transfer provision of the Juvenile Court Act. 705 ILCS 405/5-130 (West 2006). He pleaded guilty and was sentenced to a 35-year prison term for first degree murder, a mandatory firearm enhancement of 25 years for personally discharging a firearm, and two consecutive terms of 20 years for the aggravated batteries, to be served consecutively to the first degree murder sentence, for an aggregate sentence of 100 years.

¶ 3     On direct appeal, we affirmed defendant's guilty plea, but vacated his sentence and remanded for a new sentencing hearing. See *People v. Pace*, 2015 IL App (1st) 110415. Our supreme court entered a supervisory order directing this court to vacate its judgment as to sentencing and "reconsider its judgment in light of *People v. Reyes*, 2016 IL 119271, to determine if a different result is warranted."

¶ 4     This court again vacated defendant's sentence and remanded for resentencing. *People v. Pace*, 2017 IL App (1st) 110415-U, ¶ 12. On remand, we directed the circuit court to consider *Reyes*, which concluded courts have "the discretion *not* to apply the firearm sentencing enhancements and, without these enhancements, the mandatory minimum aggregate sentence to which defendant would be subject is 32 years, a term that is not a *de facto* life sentence." (Emphasis in original.) *Reyes*, 2016 IL 119271, ¶ 12; see also *Pace*, 2017 IL App (1st) 110415-U, ¶ 11.

¶ 5     On resentencing, the circuit court did not impose a firearm enhancement. The court sentenced defendant to 35 years' imprisonment for the first-degree murder conviction and two 20-year sentences for each of the aggravated battery convictions, all to run consecutive to each other for an aggregate sentence of 75 years. Defendant appeals this sentence.

¶ 6                                    BACKGROUND

¶ 7     This court has previously described the underlying facts of this case in a full opinion. See *Pace*, 2015 IL App (1st) 110415. Therefore, we will describe only those facts necessary for our discussion of the specific sentencing issues on appeal.

¶ 8     On December 20, 2017, the circuit court conducted a resentencing hearing. Defendant was 27 years old at that time. The State tendered an updated presentence investigation report (PSI), which described that in 2013, defendant had been convicted of unlawful possession of contraband in a penal institution and was sentenced to four years' imprisonment. Further, in 2015, defendant had earned his GED while incarcerated. Six months before the resentencing hearing, defendant began taking medication and made two additional suicide attempts following an initial attempt in 2007. The PSI also stated that he left the Gangster Disciples in 2013, but did not participate in a "violation," a violent ritual, for leaving the gang.

¶ 9     Lieutenant James Shaw of the Illinois Department of Corrections (IDOC) testified that he oversaw intelligence operations, but had no personal knowledge of defendant in that capacity. He reviewed defendant's master file containing the records from defendant's incarceration in preparation for his testimony. The master file showed that defendant never renounced his membership in the Gangster Disciples. Since his entry into IDOC in 2009, defendant accumulated 47 disciplinary tickets, including 5 in 2010, 1 in 2011, 4 in 2012, 10 in 2013, 1 in 2014, 7 in 2015, 16 in 2016, and 3 in 2017. According to Lieutenant Shaw, when a ticket is issued to an inmate, the staff member writes an incident report and a panel comprised of a counselor, hearing officer, and an adjustment committee member conducts a hearing.

¶ 10    On January 22, 2010, an IDOC officer issued a ticket for disobeying a direct order, insolence, intimidation, and threats, in addition to telling the officer, "f*** you bitch. Don't tell

me what to do. I will f*** you up, m***. Check my record." The IDOC placed defendant in segregation for three months, which included three months of commissary restrictions and a "C-grade," the worst rating an inmate can receive, resulting in the restriction of family visits and phone privileges.

¶ 11    Defendant received a ticket for committing an assault later that same year on November 10. While being escorted in handcuffs by a sergeant, he pulled away, causing the sergeant's hand to get caught and twisted in the handcuffs. The IDOC sentenced defendant to six months' segregation with another C-grade. A second incident occurred that day. Defendant refused to return to his cell and told the IDOC officer to "f*** off." In addition, he pushed the officer, elbowing him in the left ear. He remained combative while IDOC officers attempted to restrain him. For those incidents, defendant received a six-month sentence of segregation and a C-grade.

¶ 12    On April 8, 2011, defendant fought three inmates and continued to fight despite orders to stand down. IDOC officers used pepper spray to gain control. Defendant again received a sentence of six months' segregation and C-grade restrictions.

¶ 13    The IDOC found dangerous contraband in defendant's cell on July 9, 2012. An officer found on defendant's person a 5-inch homemade weapon sharpened to a point, with a piece of clothing taped to the end as a handle. Defendant had removed a metal shaft from a fan to create the weapon. In addition to internal IDOC punishment, defendant was convicted for possession of a dangerous weapon in prison, resulting in an additional four-year sentence.

¶ 14    On October 26, 2013, an IDOC intelligence unit found letters concealed in defendant's property box, which showed his continued involvement in the Gangster Disciples. The letters outlined a pledge and "new concept vision structure" for the gang and threatened that "[t]hose who shall violate these articles will be charged with disrupting the organization's unity and dealt with

in the fashion that labeled them as an enemy to the people." Defendant received a one-year segregation sentence with six months' loss of good time, among other restrictions.

¶ 15    Another incident of misconduct involving defendant occurred on November 15, 2013. Defendant yelled at a female IDOC officer, "you bitch. I see you there. Don't you think I give a f*** about your ticket. F*** you, you scary ass bitch. You coward ass." Defendant received one month of segregation and two months' C-grade restrictions.

¶ 16    Defendant again fought with an inmate on December 9, 2016 and received disciplinary punishment. Finally, in January 2017, defendant received a ticket for an incident involving intimidation and disobeying a direct and unauthorized movement. He refused to comply with an order to keep moving and held up the line. He was taken back to his cell, where he began chanting "kill that bitch" to the IDOC officer. He received two months' segregation and C-grade restrictions.

¶ 17    After Lieutenant Shaw's testimony, the circuit court viewed video clips and photographs that showed defendant's commission of the shooting. The parties stipulated to the testimony of shooting victims Christine Coley and Megan James from the original sentencing hearing and to a certified copy of conviction for the Class 1 offense of unlawful possession of contraband in a penal institution from June 10, 2013.  The parents of Blair Holt, one of the victims, also submitted impact statements.

¶ 18    Arthur Dunn, a youth prevention specialist and mentor at the South Side Help Center who had counseled defendant, testified in mitigation regarding defendant's academic difficulties, fear of gangs, and family influences.

¶ 19    The defense next called Dr. Tim Jon Semmerling, who was retained by the Office of the Public Defender, to conduct an investigation for mitigation. Dr. Semmerling prepares mitigation

reports for state, federal, and military cases. He stated that he "spent a lot of time" with defendant and conducted 27 interviews, including 15 with defendant. He also reviewed documents including IDOC records, high school transcripts, court transcripts, and previous neuropsychological and forensic psychological evaluations. He gave an extensive summary of defendant's upbringing and family life. He also related that another inmate taught defendant how to read and that defendant has earned his GED.

¶ 20    Defendant also told Dr. Semmerling that he was remorseful for the shooting. Defendant suffers from depression because of the incident and had been on suicide watch at certain times during the past four years.

¶ 21    Next, the parties stipulated to the previous testimony of Dr. Robert Hanlon, the defense's expert in neuropsychology. Dr. Hanlon conducted a neuropsychological evaluation of defendant, which revealed that he had an IQ of 77, which according to Dr. Hanlon was in "the borderline range of intelligence." He explained that meant defendant was "above the mental retardation range, but below the low average range." The evaluation also showed that defendant had a "nonverbal learning disorder."

¶ 22    Following additional arguments in aggravation and mitigation, the defendant made a statement to the Holt family, offering an "everlasting apology of immeasurable regard for ending the life of your dear son, Blair. I am sorry." He also apologized to the other victims, their families, and anyone else who was harmed by his actions.

¶ 23    The circuit court took the case under advisement and at the next hearing, defendant requested to proceed *pro se* and file a motion to transfer the case to the juvenile division. The court reminded defendant that he had been convicted of murder and that his case was not eligible for transfer to the juvenile division. Defendant declined to proceed *pro se*.

¶ 24    In sentencing, the circuit court announced that it considered the facts of the case, the updated PSI, and the evidence in aggravation and mitigation. The court also considered the victim impact statements, the video clips and crime scene photographs, and the testimony concerning defendant's disciplinary tickets while incarcerated, one of which resulted in a new conviction for unlawful possession of contraband in a penal institution and a four-year prison sentence to run consecutive to this case. In addition, the court reviewed the testimony of Dunne and Dr. Semmerling, a letter from defendant's former girlfriend, Patrice Johnson, the reports from Dr. Hanlon and Dr. Semmerling, and defendant's statement in allocution.

¶ 25    Further, the circuit court considered the statutory factors in aggravation and mitigation. The court stated that defendant's actions were "evil," "cold," "calculated," and "premeditated," with "the specific intent to kill."

¶ 26    The circuit court recognized the changes in sentencing laws for juvenile offenders since the imposition of defendant's original sentence. The court stated that "[t]he law now requires that courts before sentencing a juvenile to life without parole or a de facto life sentence take into account how children are different, [and] how those differences council against irrevocably sentencing them to life in prison." The court discussed application of the juvenile sentencing factors under *Miller v. Alabama*, 567 U.S. 460 (2012), including: "a child's diminished culpability and heightened capacity for change," "the fact that children are immature, irresponsible, reckless, impulsive and vulnerable to negative influences," a child's lack of control over their environment, and their ability to extricate themselves from crime-producing circumstances. The court also noted the codification of the *Miller* factors by the Illinois legislature.

¶ 27    The circuit court applied the *Miller* factors, finding "there is mitigation in this matter." The court stated:

"Certainly, the defendant's age. He was 16. He was immature. He lacked a level of maturity. He suffered from cognitive and developmental disability. He was subject to outside pressure in his gang with his younger brother. He experienced a difficult childhood. He didn't have the direction of a father. He was subject to abuse himself coming up. Lived in terrible circumstances. He has stood up and expressed remorse for the offense.

The court is required to consider his rehabilitative potential in individuals who were -- youthful offenders have a greater capacity for rehabilitation. With this regard, we are now ten years later, and do I hear that in the last ten years [defendant] has been a model prisoner? No. Do I hear that he has tried to atone for his crime by being the mentor to other young offenders, by being the guy in the library telling them that life is too short, life is too precious to run the streets gang-banging, selling drugs with a gun in your pocket? No.

What I hear is that the defendant has 47 tickets for disciplinary problems; that he fights and threatens other inmates and security guards; that he has committed a new felony which resulted in a conviction and a consecutive sentence.

So I have considered all of these factors in the course of my analysis. And as I moved on, I also then reflected on the defendant's original sentence and -- that he received, 35 years for the murder of Blair Holt, 20 years consecutive for the aggravated battery to Christina Coley, and 20 years for the aggravated battery of Megan James. And after considering all of these factors -- and it is a matter of my judicial discretion -- I find that those numbers to be entirely appropriate.

But that still leaves the court with the question of whether or not to impose the 25 year firearm enhancement, which was mandatory in 2009 but is now discretionary. And based upon the additional information which this court has heard, the mitigation, I am going to decline to impose the enhancement."

¶ 28 The circuit court sentenced defendant to a total of 75 years' imprisonment, including 35 years for first degree murder and two consecutive 20-year prison terms for the aggravated battery convictions, to run consecutively to his 4-year sentence for possessing dangerous contraband while incarcerated. The court calculated that even without the firearm enhancement, the defendant would not be eligible for release until he was about 85 years old.

¶ 29 Defendant moved to reconsider his sentence. The circuit court denied defendant's motion, stating that "this is not a mandatory life sentence, though, he was a juvenile; thus, it does not violate the Eighth Amendment." The court stated that whether or not its imposition of the sentence was a *de facto* life sentence was "up for interpretation." The court then stated "[i]t's true that the defendant, if he successfully completes the sentence, will be in his 80s. However, I just had two family members who celebrated their 90th birthday, so I don't know that it is necessarily a de facto life sentence." The court further explained:

"Even if it is or if some court at a later date determines that it is, I believe that it is the appropriate sentence, even after having considered the additional juvenile sentencing factors, as we've discussed on the date of sentencing. Because he did have his quote, unquote Miller [*sic*] hearing, and those factors were considered."

¶ 30 This appeal followed.

¶ 31                                    ANALYSIS

¶ 32    Defendant argues that his 75-year aggregate sentence is a *de facto* natural life sentence, imposed without the required determination of permanent incorrigibility, in violation of the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Alternatively, he contends that his 75-year prison sentence is excessive in light of the extensive mitigation evidence he presented.

¶ 33

¶ 34    A circuit court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We must give "substantial deference" to the circuit court's sentencing decision "because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. Accordingly, we will not disturb the court's sentencing decision absent an abuse of discretion. *Id.*

¶ 35                          Constitutionality of Defendant's Sentence

¶ 36    The *Miller* Court held that mandatory life imprisonment without parole for juvenile offenders violates the eighth amendment's ban on cruel and unusual punishment. 567 U.S. at 489; see also U.S. Const., amend. VIII. In *Montgomery v. Louisiana*, 577 U.S. ---, 136 S. Ct. 718 (2016), the Supreme Court explained that, under *Miller*, life imprisonment without parole is unconstitutional for "juvenile offenders whose crimes reflect the transient immaturity of youth"; that is, "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at ---, 136 S. Ct. at 734.

¶ 37    In a line of recent cases, the Illinois Supreme Court has extended the express holdings in *Miller* and *Montgomery*. In *People v. Holman*, 2017 IL 120655, ¶ 40, the court held that the eighth amendment also requires a judge to give individualized consideration to a juvenile defendant's youth and attendant characteristics before imposing a *discretionary* sentence of life in prison. And in *Reyes*, 2016 IL 119271, ¶ 9, the court held that a life sentence, for purposes of the eighth amendment, includes a "*de facto* life sentence"—a term of years that, while not an "actual" life sentence, is nonetheless "unsurvivable," and thus has the "same practical effect on a juvenile defendant's life." A sentence of more than 40 years on a juvenile offender is a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41. Therefore, defendant's 75-year sentence qualifies him for the protections that *Miller* affords a juvenile. *Id.*

¶ 38    Defendant argues that the circuit court imposed the *de facto* natural life sentence without determining whether his crimes reflected permanent incorrigibility or irretrievable depravity. *Miller* makes clear that a sentence of life without parole is an unconstitutional penalty only for "juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 577 U.S. at ---, 136 S. Ct. at 734. Accordingly, *Miller* requires that courts consider a juvenile offender's "diminished culpability and heightened capacity for change" before imposing a sentence of life in prison. *Miller*, 567 U.S. at 479. To prevail on his *Miller* claim, defendant must show not only that he was sentenced to a lifetime in prison but also that "the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27; see also *Holman*, 2017 IL 120655, ¶ 37. Although neither *Miller* nor *Montgomery* required sentencing courts to make findings of fact regarding a juvenile's incorrigibility, our supreme court agreed with other jurisdictions that "a trial court must consider some variant of the *Miller* factors before

imposing a life sentence without the possibility of parole." *Holman*, 2017 IL 120655, ¶¶ 39, 43-44. The factors include, but are not limited to:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46.

¶ 39      In *People v. Croft*, this court held that the resentencing court properly considered the *Miller* and *Holman* factors when imposing a life sentence, even without an express finding of permanent incorrigibility. 2018 IL App (1st) 150043, ¶¶ 31-33. This court reached the same conclusion in *People v. Johnson*, holding that " 'the *Holman* factors were sufficiently addressed' and 'we cannot say that defendant's sentencing hearing was constitutionally defective.' " 2018 IL App (1st) 153266, ¶ 26 (quoting *Croft*, 2018 IL App (1st) 150043, ¶ 32). Relevant here, the *Croft* court noted that the *Holman* factors are "a nonexhaustive list" and that "nothing in *Miller* or *Holman* suggests that we are free to substitute our judgment for that of the sentencing court" because the issue is not the particular sentence the circuit court imposed but whether the defendant had the opportunity to present evidence regarding his youth and the court considered his youth and its attendant circumstances when determining the sentence. *Croft*, 2018 IL App (1st) 150043, ¶¶ 32-33.

¶ 40      In this case, the circuit court considered each of the *Miller* factors articulated in *Holman*. Regarding the first factor – defendant's age at the time of the offense and any evidence of his

particular immaturity, impetuosity, and failure to appreciate risks and consequences – counsel argued defendant's age in mitigation and the court noted that defendant was 16 years old at the time of the offense. Indeed, the court specifically noted defendant's immaturity in its findings and stated that "[h]e suffered from cognitive and developmental disability." As to the second factor – defendant's family and home environment – the circuit court noted that defendant experienced a difficult childhood and did not have the direction of a father. The court also stated that defendant "was subject to abuse himself coming up. Lived in terrible circumstances." Next, the circuit court addressed the third factor – defendant's degree of participation in the offense and any evidence of familial or peer pressures that may have affected him. The court considered that defendant "was subject to outside pressure in his gang with his younger brother." Regarding the fourth factor – defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys, the circuit court noted that defendant "has stood up and expressed remorse for the offense." Finally, as to the fifth factor, defendant's rehabilitative prospects, the circuit court considered defendant's evidence and arguments in mitigation, and the State's evidence in aggravation and evidence of his post-incarceration conduct. The court noted that defendant had amassed 47 tickets for disciplinary problems, that he fought and threatened other inmates and security guards, and that he had committed a new felony which resulted in a conviction and a consecutive sentence.

¶ 41    Although the circuit court did not expressly find defendant permanently incorrigible, it concluded that his actions were "evil," "cold," "calculated," and "premeditated," with "the specific intent to kill." In *Croft*, the circuit court also did not expressly find the defendant incorrigible, but determined he was "really cold hearted, almost inhuman in his participation in his brutal, heinous, evil doing." (Internal quotation marks omitted.) 2018 IL App (1st) 150043, ¶ 31. We follow *Croft*

and *Johnson* and agree that the circuit court sufficiently addressed the factors set forth in *Miller* and *Holman*. We conclude that defendant's sentencing hearing passed constitutional muster. *Croft*, 2018 IL App (1st) 150043, ¶ 32; *Johnson*, 2018 IL App (1st) 153266, ¶ 26. Further, the court specifically considered the extensive evidence of defendant's cognitive disability during the sentencing proceedings. We find no error in the circuit court's application of *Miller* and related cases in imposing its sentence.

¶ 42    We next address an issue which this court raised *sua sponte*. This court ordered defendant to file a supplemental memorandum "addressing the applicability, if any, that the doctrine that, '[b]ad conduct while imprisoned cannot buttress a finding of incorrigibility' has to this appeal," under *Holman*, 2017 IL 120655, ¶ 47. The defendant filed a supplemental memorandum and the State filed a response. At the defendant's resentencing hearing, extensive evidence of defendant's post-incarceration conduct was presented. The circuit court specifically relied on this evidence when it determined the defendant's sentence. At first blush, the *Holman* court's statement instructing courts to disregard post-incarceration conduct seems to be relevant here. However, in the supplemental briefing, the defendant took the position that *Holman* was inapposite because it involved a post-conviction petition and a sentence of natural life, rather than a term for years which amounted to a *de facto* life term.

¶ 43    The State agrees, and it relies on the familiar principle that when a defendant's sentence has been set aside and remanded for resentencing, the resentencing court may consider the defendant's post-sentencing conduct, good or bad. See 730 ILCS 5/5-5-3(d) (West 2016) ("In any case in which a sentence originally imposed is vacated, the case shall be remanded to the trial court *** [for] a hearing under section 5-4-1 of the Code [730 ILCS 5/5-4-1 (West 2016)] which may include evidence of the defendant's life, moral character and occupation during the time since the

original sentence was passed"); and 730 ILCS 5/5-4-1 (West 2016) (when a sentence has been set aside on direct review or on collateral attack, the court may impose a new sentence which is more severe than the prior sentence if it "is based upon conduct on the part of the defendant occurring after the original sentencing"). To grant defendant relief based on this statement in *Holman*, we would have to impliedly find that these resentencing statutes are unconstitutional as applied, something which neither party has urged.

¶ 44    In *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008), Justice Ginsburg, writing for the majority, explained:

> "In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a *pro se* litigant's rights. But as a general rule, our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." (Internal quotations and citations omitted.)

¶ 45    In light of the defendant's position on this issue and the state of the law as it currently stands, we will decline to reach the issue framed by our supplemental brief order and resolve the case on the issues presented by the parties.

¶ 46                    Whether Defendant's 75-Year Sentence is Excessive

¶ 47    Defendant alternatively argues that his *de facto* life sentence is excessive given the extensive mitigation history presented. He contends that the circuit court failed to properly

consider the evidence in mitigation and instead relied on a hypothetical situation expressly refuted by the evidence.

¶ 48    "It is well settled that the trial court has broad discretionary powers in imposing a sentence [citation], and the trial court's sentencing decision is entitled to great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). As such, we may set aside a sentence only when it constitutes an abuse of discretion. *People v. Velez*, 388 Ill. App. 3d 493, 514 (2009). The circuit court is afforded such deference because it "has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Stacey*, 193 Ill. 2d at 209. We may not substitute our judgment for that of the circuit court's merely because we would have weighed the sentencing factors in a different manner. *Id.* "[A] sentence within the statutory limits will only constitute an abuse of discretion if 'it is manifestly disproportionate to the nature of the offense.' " *People v. Martin*, 2012 IL App (1st) 093506, ¶ 47 (quoting *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007)).

¶ 49    When imposing a sentence, the circuit court "need not articulate the process by which it determines the appropriateness of a given sentence." *People v. Wright*, 272 Ill. App. 3d 1033, 1045-46 (1995). The court is not required to "expressly indicate its consideration of mitigating factors." *Id.* Instead, "[w]here mitigating evidence is before the court, it is presumed the court considered that evidence absent some contrary indication other than the sentence imposed." *People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993); see also *Wright*, 272 Ill. App. 3d at 1046 ("Where the sentencing court examines a presentence report, it is presumed that the court considered the defendant's potential for rehabilitation.").

¶ 50    In this case, the applicable sentencing range for first-degree murder extended from 45 years at a minimum, including the statutory enhancement for discharge of the firearm, to natural life.

730 ILCS 5/5-4.5-20(a), 5-8-1(a)(1)(d)(iii) (West 2016). Further, defendant pled guilty to two counts of aggravated battery with a firearm, which is a Class X felony with a sentencing range between 6 and 30 years in IDOC. 720 ILCS 5/12-3.05(e)(1) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). Thus, the circuit court's imposed 75-year aggregate sentence falls within the statutory ranges for each of these offenses, even without including the statutory enhancement for discharge of the firearm, which the court, in its discretion, declined to impose.

¶ 51    Defendant argues the circuit court "offered lip service" to his youthfulness in mitigation, but a review of the record belies this contention. The court considered evidence in mitigation including the PSI, the letter from Johnson, and testimony from Dr. Hanlon, Dr. Semmerling, and Dunne. The court also considered Dr. Semmerling's extensive mitigation report. Finally, the court considered defendant's statement in elocution. In its opening brief, defendant's quote from the record that the court found "little mitigation" is misleading. The report of proceedings shows the court made this statement in reference to the applicable statutory mitigating factors and not to the available evidence it reviewed in mitigation. The court specifically addressed the areas of concern defendant raises, including defendant's cognitive and intellectual disabilities.

¶ 52    The circuit court had a superior opportunity to evaluate defendant's credibility, demeanor, and character, and we are prohibited from substituting our judgment for that of the circuit court simply because we might have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13. Since defendant's sentence falls within the sentencing range, we cannot say that it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id*. at 212. As a result, the circuit court did not abuse its discretion in imposing this sentence. *Id*.

¶ 53   Finally, during the sentencing hearing, the circuit court asked "what if a squad car had been following the bus and engaged the defendant in a shoot-out? Other innocent bystanders could have been killed or injured or the defendant could have been shot and killed himself. I don't doubt that there is some in this room that would feel this would have been the appropriate disposition." While personal observations by sentencing judges can sometimes be problematic, we will not find an abuse of discretion if the record shows that the sentencing court considered proper sentencing factors because the circuit court is ordinarily best situated to tailor a sentence. *People v. Steppan*, 105 Ill.2d 310, 323 (1985) ("[t]he fact that the sentencing judge added some personal observations before imposing sentence, while not to be encouraged, is of no consequence"); *People v. Bosley*, 197 Ill. App. 3d 215, 222 (1990) (the sentencing court's comment regarding the rate of recidivism for sex offenders who receive no counselling "was of no untoward consequence in the exercise of its sentencing discretion" even though such personal observations are not encouraged). We find the circuit court's comments did not constitute an abuse of discretion.

¶ 54                                    CONCLUSION

¶ 55   The judgment of the circuit court of Cook County is affirmed.

¶ 56   Affirmed.