NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220389-U

NO. 4-22-0389

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 28, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| ANTONIO PHILLIPS, | ) | No. 10CF86 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Raylene Grischow, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Zenoff and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) The trial court did not err by granting the State's motion to dismiss defendant's amended postconviction petition on the basis that it did not make a substantial showing of a constitutional violation.

(2) Defendant failed to establish that he was entitled to additional second-stage postconviction proceedings due to the alleged unreasonable assistance of his postconviction counsel.

¶ 2     Defendant, Antonio Phillips, appeals from the trial court's second-stage dismissal of his postconviction petition. He argues he is entitled to remand for further postconviction proceedings because (1) his petition made a substantial showing that his constitutional right to conflict-free representation was violated and (2) he received unreasonable assistance from his postconviction counsel due to counsel's failure to pursue defendant's *pro se* claim that his *de facto* life sentence was unconstitutional. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4            In February 2010, a grand jury indicted defendant on one count of first degree

murder (720 ILCS 5/9-1(a)(3) (West 2008)) and one count of armed robbery (*id.* § 18-2(a)). The

charges were based on allegations that defendant, or someone for whom he was legally

accountable, took a wallet from the victim, William Suggs, by the use of force and while carrying

a firearm and discharged that firearm, striking Suggs and causing his death.

¶ 5            In March 2013, defendant's jury trial was conducted. The State's evidence showed

that at approximately 12:44 a.m. on December 10, 2009, the Springfield Police Department

received a report of a "slumped male driver." Officers responded to the scene and found Suggs

seated behind the wheel of a vehicle. He had been shot in the face at close range and was deceased.

¶ 6            During the course of the investigation into Suggs's murder, defendant and his

cousin, Jonathon Phillips, came to the attention of the police. The State's evidence showed that

defendant and Jonathon were together the evening of December 9, 2009, in the hours prior to the

shooting. Two witnesses testified that they saw defendant and Jonathon that evening and heard

them discuss committing a robbery. The same night, Jonathon was both observed and

photographed with a gun. An individual who resided with Jonathon's mother reported seeing

defendant and Jonathon during the evening of December 9 or the early morning hours of December

10, 2009. Defendant appeared nervous. He reported that he and Jonathon had been "riding with a

friend," and after Jonathon exited the vehicle to smoke a cigarette, defendant told the friend to

"give it up." Defendant and the friend then scuffled with the gun, and it discharged. Defendant

stated he and Jonathon fled the scene in different directions.

¶ 7            The State's evidence showed that in the days after the shooting, defendant sold a

gun to an individual named Hayes Miller and fled Springfield. The gun defendant sold was later

recovered by the police. Forensic testing showed the bullet recovered from Suggs's body "could have been fired from" that gun. While in jail following his arrest, defendant told another inmate that he needed to "get in touch with *** Miller so they [could] get rid of the gun that had a body on it." After his arrest, defendant was also interviewed twice by the police. He denied any connection to the charged offenses, but his story changed several times. Ultimately, defendant admitted to being inside of Suggs's car on the night of the shooting and disposing of Suggs's wallet.

¶ 8        Finally, the State presented evidence of an armed robbery that occurred on December 6, 2009, four or five blocks away from where Suggs was later found. The victim in that case was a taxicab driver, who stated he picked up a fare and was robbed at gunpoint. The victim identified defendant as his assailant from a photographic lineup.

¶ 9        The jury found defendant guilty of both charged offenses. In May 2013, the trial court denied defendant's posttrial motion and conducted his sentencing hearing. Defendant's presentence investigation report (PSI) showed he was born in February 1990 and was 19 years old at the time of the alleged offenses. He had prior juvenile adjudications for two counts of battery and one count of disorderly conduct in 2004 (Sangamon County case No. 04-JD-16) and for possession of a controlled substance in 2006 (Sangamon County case No. 06-JD-43). In connection with his 2004 case, defendant was placed on one year of probation, beginning in May 2004. His probation was extended to August 2005 "due to a revocation based on his failure to attend school." In August 2005, a petition to revoke defendant's probation was filed, alleging he ingested illegal substances. His term of probation terminated the same month.

¶ 10        In his 2006 case, defendant was again placed on probation for a period of one year. In December 2006, he was determined to have violated his probation and was committed to the

juvenile division of the Illinois Department of Corrections (DOC). Twice, defendant was granted parole, but he was recommitted after parole violations. He was ultimately released from DOC in September 2009. Although defendant's PSI showed he had no prior adult criminal convictions at the time of his sentencing in the underlying case, he had pending felony charges for armed robbery and aggravated robbery (Sangamon County case No. 09-CF-1084) and a pending misdemeanor charge for criminal damage to property (Sangamon County case No. 09-CM-410).

¶ 11        The PSI further showed that defendant was the youngest of nine children born to his mother. He had no contact with his biological father since birth. At age five, defendant was adopted by his aunt "due to his mother's drug use and inability to care for the defendant or his siblings." In 2004, defendant's aunt passed away and defendant began living with his older sister, who became his guardian. Defendant reported that he had regular contact with his mother. He also had one daughter, who was four years old and resided with her mother in Minnesota.

¶ 12        According to the PSI, defendant had completed school through only the eighth grade, and he had no known history of employment. He reported that he began consuming alcohol at age 16 and used alcohol on a regular basis until his arrest for the underlying offenses. Defendant stated he began using cannabis on a regular basis at nine years old and that he used cannabis " 'all day, everyday', before his arrest." He denied any other drug use.

¶ 13        As evidence in aggravation, the State presented testimony from Detective Ryan Sims with the Springfield Police Department. Sims testified he investigated the underlying offenses, as well as an armed robbery that occurred on October 27, 2009, approximately three blocks from where Suggs's body was later found. The victim in the October 2009 case reported that she stopped her vehicle at a four-way stop around 1 a.m., when a male opened her passenger door, entered her vehicle, pointed a gun at her, and forcefully demanded money. The man took

$40 from the victim and fled the scene. Sims stated he showed the victim a photographic lineup and she identified defendant as the person who robbed her.

¶ 14        The record reflects the State also presented testimony from Suggs's mother, who described the effect Suggs's death had upon his family. The trial court considered victim impact statements written by both of Suggs's parents, as well as defendant's PSI. Defendant did not present any additional evidence.

¶ 15        The State argued defendant faced a sentencing range of 35 to 75 years in prison— a range of 20 to 60 years for murder plus a 15-year sentencing enhancement due to the use of a firearm. It recommended that the trial court impose a 60-year sentence, noting defendant's history of delinquency and criminal activity and arguing he was a danger to the community. Defendant's counsel asked the court to impose a 35-year sentence, arguing defendant's criminal conduct was facilitated by Jonathon and noting defendant's "youth" and lack of an adult record.

¶ 16        Finding defendant's armed robbery count merged into his first degree murder count, the trial court sentenced defendant to 65 years in prison for first degree murder. The court stated it had considered the evidence presented and "studied" defendant's PSI and concluded as follows: "[A]lthough [defendant] does not have an adult history *** this very young man is a threat to our society."

¶ 17        Defendant filed a motion to reconsider his sentence, arguing the trial court failed to adequately consider mitigating evidence contained within his PSI, specifically his age, potential for rehabilitation, strong family ties, strong community ties, and "that an excessive term of imprisonment [would] entail [an] excessive hardship to his family." On May 29, 2013, the court conducted a hearing on defendant's motion. Defendant's counsel asked the court to reconsider the sentence it imposed and "refocus on [defendant's] age." He argued defendant had a child and was

"so young that the potential for rehabilitation *** [was] great." The court denied the motion, stating as follows:

"I did take into account all of the factors in aggravation and what factors in mitigation that there were, and I believe the 65 years was a very appropriate sentence considering the horrendous nature of this offense, the damage that it caused, the other evidence presented by the State as to this individual basically wreaking havoc in the area [in] a very short time before this occurrence took place."

On direct appeal, this court affirmed the trial court's judgment. *People v. Phillips*, 2015 IL App (4th) 130459-U, ¶ 50.

¶ 18    In March 2016, defendant filed a *pro se* postconviction petition, raising several claims of alleged constitutional error. Relevant to this appeal, he asserted that his 65-year sentence violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because when imposing his sentence, the trial court failed to consider his youth, his "minimal involvement in the commission of the" charged offenses, or his lack of a prior violent criminal history. To support his claim, defendant cited case authority, including United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), which recognized that juveniles are constitutionally different from adults for sentencing purposes and setting forth limits on the imposition of life sentences for juvenile offenders. Defendant pointed out that he was 19 years old at the time of the alleged offenses and argued that sentencing considerations applicable to juvenile offenders should also be applied to him as a young adult.

¶ 19    The trial court advanced defendant's *pro se* petition to the second stage of postconviction proceedings and appointed counsel for defendant. In August 2021, defendant's

postconviction counsel filed an amended postconviction petition on defendant's behalf. The petition set forth a single claim of error that defendant was deprived of his constitutional right to the effective assistance of counsel because his trial attorney, Craig Reiser, contemporaneously represented "a potential State witness."

¶ 20        In the amended petition, defendant alleged Reiser represented him in the underlying case from February 11, 2010, shortly after the charges were filed against him, through May 22, 2013, the date of his sentencing. He asserted that on March 25, 2010, Reiser also began representing an individual named Maurice Watts in an unrelated case, which went to trial on July 21, 2010, and during which "Reiser served as lead defense counsel." According to defendant, Watts was "housed" at the Sangamon County Jail with both defendant and Jonathon from March to October 2010. Defendant alleged that in May 2010, Watts contacted the police about defendant's and Jonathon's cases, "ostensibly to help himself." On May 18, 2010, Watts met with detectives at the jail and told them "damaging information about [defendant]," specifically that he overheard defendant confess to shooting Suggs. Defendant alleged that Watts appeared on the State's witness list in his case and that he had been unaware that "a potential State witness was also being represented by his attorney." Defendant maintained such circumstances resulted in a *per se* conflict of interest and a violated his sixth amendment right to counsel.

¶ 21        In support of his claim, defendant presented a police report, dated June 15, 2010, and which described law enforcement's May 18, 2010, interview with Watts. According to the report, detectives met with Watts at the Sangamon County Jail. Watts reported that he knew defendant and Jonathon from "being in jail," and stated he had been "housed with them both on separate occasions." During the interview, Watts reported that Jonathon told him that defendant had robbed and shot Suggs. Watts also asserted that he heard defendant make incriminating

- 7 -

statements about his involvement in Suggs's murder.

¶ 22    Defendant also presented a printout from the Sangamon County Circuit Clerk's Office of the case information for Watt's criminal case (Sangamon County case No. 10-CF-153). The printout showed that on March 25, 2010, Reiser was appointed to represent Watts in that case. Reiser's representation continued through the date of Watts's July 2010 jury trial, which resulted in a guilty verdict, and Watts's sentencing in October 2010. Reiser's representation of Watts ended on December 20, 2010, when, after the trial court denied Watts's motion to reconsider his sentence, Watts asserted his desire to appeal, and the court appointed the Office of the State Appellate Defender to represent him.

¶ 23    The underlying record in defendant's case shows that in August 2012, the State disclosed a "[r]ecorded [i]nterview" with Watts and named Watts as a potential witness in defendant's case. In March 2013, Watts's name also appeared on an amended witness list disclosed by the State. Ultimately, however, Watts did not testify as a witness at defendant's jury trial.

¶ 24    In August 2021, defendant's postconviction counsel filed an amended certificate pursuant to Rule 651(c) (eff. July 1, 2017). Counsel asserted as follows:

"1. I am the attorney for the [defendant].

2. I have consulted with the [defendant] via telephone to ascertain his contentions of deprivation of constitutional rights.

3. I have examined the record of the trial proceedings.

4. Amendments to the petition filed *pro se* are required for an adequate representation of [defendant's] contentions."

¶ 25    In September 2021, the State filed a motion to dismiss defendant's amended postconviction petition. It asserted defendant's claim of error was "waived" because it could have

been raised on direct appeal but was not. Alternatively, the State asserted defendant's allegations did not support a claim of ineffective assistance based on a *per se* conflict of interest because Reiser did not contemporaneously represent a prosecution witness at the time of defendant's trial. It noted that Reiser's representation of Watts ended before Watts appeared on the State's witness list in defendant's case and that Watts was ultimately never called to testify as a witness at defendant's trial.

¶ 26 Following a hearing and additional filings by the parties, the trial court entered a written order in February 2022, granting the State's motion to dismiss defendant's amended postconviction petition. In setting forth its decision, the court noted that Reiser's representation of Watts ended in December 2010, and that Watts did not appear on the State's witness list in defendant's case "until approximately two years later." Additionally, it pointed out that defendant's trial did not begin until March 2013 and that Watts was never called to testify. The court concluded that, "[w]hile Reiser did represent both Watts and [defendant] in 2010, a significant amount of time elapsed before [defendant's] case went to trial" and "there was no *per se* conflict because Watts was never an actual witness."

¶ 27 This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29                          A. Second-Stage Dismissal of
                         Defendant's Amended Postconviction Petition

¶ 30 On appeal, defendant first argues that the trial court erred by granting the State's motion to dismiss his amended postconviction petition at the second stage of postconviction proceedings. He contends his petition made a substantial showing that his sixth amendment right to counsel was violated because Reiser, his trial attorney, "labored under an undisclosed *per se* conflict of interest by contemporaneously representing [him] and *** Watts[,] who was a witness

for the prosecution against [him]."

¶ 31 "The Post-Conviction Hearing Act [(Act)] provides a procedural mechanism through which criminal defendants can assert that their federal or state constitutional rights were substantially violated in their original trials or sentencing hearings." *People v. Buffer*, 2019 IL 122327, ¶ 12, 137 N.E.3d 763. "The Act provides a three-stage process for the adjudication of postconviction petitions." *Id.* ¶ 45. At the first stage, the trial court independently reviews the defendant's petition without input from the State. *People v. House*, 2021 IL 125124, ¶ 16, 185 N.E.3d 1234. The court may summarily dismiss the petition upon a determination that "it is 'frivolous or is patently without merit.' " *Id.* (quoting 725 ILCS 5/122-2.1(a)(2) (West 2008)).

¶ 32 A petition that is not summarily dismissed advances to the second stage, where the trial court may appoint counsel to represent the defendant and the State may file responsive pleadings. *Id.* ¶¶ 16-17. During the second stage, the court determines "whether the postconviction petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* ¶ 17.

> "The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767.

A petition that makes a substantial showing of a constitutional violation at the second stage of proceedings will be advanced for a third-stage evidentiary hearing, while one that does not is subject to dismissal. *House*, 2021 IL 125124, ¶ 17. The second-stage dismissal of a postconviction petition is subject to *de novo* review. *People v. Dupree*, 2018 IL 122307, ¶ 29, 124 N.E.3d 908.

¶ 33　　　　As set forth above, defendant's amended postconviction petition alleged Reiser, his defense counsel, labored under a *per se* conflict of interest. "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36, 184 N.E.3d 269. "Such representation means assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 102, 106 N.E.3d 944.

¶ 34　　　　"Illinois law recognizes two types of conflict of interest—actual and *per se*. *Yost*, 2021 IL 126187, ¶ 37. "A *per se* conflict of interest exists when specific facts about the defense attorney's status, by themselves, create a disabling conflict." *Id.* ¶ 39. To establish the existence of a *per se* conflict, a defendant is not required to show that his counsel's performance was affected by the conflict or that he suffered actual prejudice. *Id.* Rather, "a criminal defendant asserting the existence of a *per se* conflict 'must show the attorney has a contemporaneous conflicting professional commitment to another.' " *Id.* ¶ 59 (quoting *People v. Hillenbrand*, 121 Ill. 2d 537, 544, 521 N.E.2d 900, 903 (1988)). Our supreme court has recognized that *per se* conflicts of interest fall into only three categories:

> "(1) when defense counsel has a contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) when defense counsel contemporaneously represents a prosecution witness; and (3) when defense counsel

was a former prosecutor who was personally involved in the prosecution of the defendant." *Id.* ¶ 66.

¶ 35    The justification for finding *per se* conflicts in the above circumstances "is that, in each situation, the defense counsel's association or tie to the victim, the prosecution, or a prosecution witness may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate." *Peterson*, 2017 IL 120331, ¶ 103. "Unless a defendant waives his right to conflict-free representation, the existence of a *per se* conflict of interest is grounds for automatic reversal." *Id.* ¶ 104. Additionally, when the facts are undisputed, the issue of whether a *per se* conflict of interest exists is a legal question that is reviewed *de novo*. *People v. Fields*, 2012 IL 112438, ¶ 19, 980 N.E.2d 35.

¶ 36    Defendant argues his case falls into the second category of *per se* conflicts of interest, in that Reiser contemporaneously represented a prosecution witness. We disagree and find the supreme court's decision in *People v. Morales*, 209 Ill. 2d 340, 808 N.E.2d 510 (2004), is dispositive of the issue.

¶ 37    In *Morales*, the defendant's attorney represented a potential State witness, Jorge Hernandez, in an unrelated federal case at the same time the attorney represented the defendant. *Id.* at 344. Ultimately, Hernandez did not testify at the defendant's trial, although parts of a letter he wrote were introduced by the State at the defendant's sentencing. *Id.* at 344-45. On appeal, the defendant claimed his attorney's contemporaneous representation of Hernandez created a conflict of interest that violated his sixth amendment right to the effective assistance of counsel. *Id.* at 345. The supreme rejected the defendant's claim, stating as follows:

> "This case most closely resembles the cases in which defense counsel contemporaneously represented a prosecution witness, because Hernandez was a

potential witness for the State. It is undisputed that [the defendant's attorney] had an attorney-client relationship with Hernandez while he represented defendant. The question becomes whether Hernandez's relationship to the case triggers the *per se* rule. *** A *per se* conflict is one in which 'facts about a defense attorney's status *** engender, *by themselves*, a disabling conflict.' [Citation.] In this case, Hernandez was a potential witness and his out-of-court statements about defendant in a letter were admitted into evidence at sentencing. However, the fact remains that he was never a witness. Thus[,] defense counsel never assumed the status of attorney for a prosecution witness. We therefore hold that [defense counsel's] simultaneous representation of Hernandez and defendant did not constitute a *per se* conflict of interest." (Emphasis in original.) *Id.* at 346.

¶ 38 The supreme court also rejected an argument by the defendant that it should "disregard Hernandez's status as merely a potential witness" because Hernandez was someone who could have benefited from an unfavorable verdict for the defendant. *Id.* It found there was no basis in the record "for concluding that Hernandez stood to gain from [the] defendant's conviction." *Id.* The court stated that "whether Hernandez wanted a particular result from [the] defendant's trial depend[ed] on unknown facts about Hernandez" and that "[s]peculation that Hernandez might have stood to benefit from a verdict against defendant [did] not support application of the *per se* rule." *Id.* at 347.

¶ 39 The circumstances of the present case are similar to *Morales*. For a period of time in 2010, Reiser contemporaneously represented defendant in the underlying case and Watts in an unrelated matter. After Reiser's representation of Watts had ended, the prosecution disclosed Watts's recorded interview with detectives and identified Watts as a potential witness in the case.

Significantly, however, Watts was never called as a witness at defendant's trial. Like in *Morales*, Reiser "never assumed the status of attorney for a prosecution witness," and his simultaneous representation of defendant and Watts did not constitute a *per se* conflict of interest. *Id.* at 346.

¶ 40        As the defendant did in *Morales*, defendant in this case suggests a different result is warranted because Watts likely expected to benefit from providing evidence against defendant. He points out that at defendant's trial, other State witnesses "explicitly testified to cooperating with the police with the hopes of securing a deal from the prosecution." However, similar to *Morales*, defendant's contentions are without factual support and entirely speculative. The allegations of his petition and the documentation he presented show only that Watts spoke with detectives about his case in May 2010 and that Watts was disclosed as a potential prosecution witness for the first time in August 2012, long after Watts had already been convicted and sentenced in his own criminal case. Defendant presents nothing to show how Watts could have benefited from a guilty verdict in defendant's case under these circumstances.

¶ 41        Defendant also asks this court to consider the special concurrence in *Morales*, wherein Justice Kilbride stated he would have found a *per se* conflict of interest based on the defense counsel's contemporaneous representation of the defendant and Hernandez, but also a waiver by the defendant of his right to conflict-free representation. *Morales*, 209 Ill. 2d at 352 (Kilbride, J., specially concurring, joined by Rarick, J.). In setting forth his rationale for finding a *per se* conflict, Justice Kilbride noted that the supreme court had "consistently held that a 'possible conflict of interest' dictated 'application of a *per se* rule.' " *Id.* Thus, he reasoned that only a " 'potential' conflict," not an " 'actual' conflict," was necessary to constitute a *per se* conflict. *Id.* He concluded that it was "enough" in the defendant's case "that the defendant's attorney [was] representing or ha[d] represented a 'potential' State's witness." *Id.*

¶ 42    We note, however, that majority decisions of the supreme court are binding upon this court when we are presented with an analogous case. See *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 61, 69 N.E.3d 834 (stating that under the doctrine of *stare decisis*, appellate courts are bound by supreme court decisions on any point and must follow those decisions in similar cases). *Morales* presents similar factual circumstances to the case at bar, and defendant presents no valid basis upon which to depart from the majority's holding in that case. See also *People v. White*, 2011 IL App (1st) 092852, ¶ 103, 963 N.E.2d 994 ("[W]e are bound by *Morales*, where the Illinois Supreme Court found no *per se* conflict when defense counsel represents a potential prosecution witness.").

¶ 43    Finally, defendant also asks us to consider and follow the First District's recent decision in *People v. Matthews*, 2021 IL App (1st) 192180-U. Although *Matthews* is an unpublished decision, it may be cited as persuasive authority on review. See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (providing that a nonprecedential order entered under Rule 23(b) "may be cited for persuasive purposes").

¶ 44    In that case, the defendant was convicted of first degree murder and sentenced to 50 years in prison. *Matthews*, 2021 IL App (1st) 192180-U ¶ 4. He later sought leave to file a successive postconviction petition, alleging, in part, that his trial attorney had labored under a conflict of interest because he contemporaneously represented a potential prosecution witness, Tarzay Wilson, in an unrelated case. *Id.* ¶ 15. He further alleged that Wilson was also the mother of his codefendant in the underlying case and a cousin to the murder victim. *Id.* Although Wilson was a named witness in the defendant's case, she did not testify at his trial. *Id.* ¶ 18. The trial court denied the defendant leave to file a successive postconviction petition, and he appealed. *Id.* ¶ 21. On review, the First District reversed, finding defendant's claims were sufficient to entitle him to

further proceedings under the Act. *Id.* ¶ 37.

¶ 45 In reaching its decision, the First District found the defendant "adequately pled a claim for a *per se* conflict of interest," noting he pled facts that detailed both his attorney's contemporaneous representation of Wilson and that Wilson "stood to benefit from the defendant's conviction." *Id.* ¶ 36. The court rejected the State's argument that no *per se* conflict existed because the potential witness did not ultimately testify at the defendant's trial. *Id.* ¶ 34. It reasoned that a possible conflict was enough to invoke the *per se* rule and cited Justice Kilbride's special concurrence in *Morales* as "instructive." *Id.* ¶¶ 34-35. The court also cited *Morales* for the proposition that "when determining whether a possible *per se* conflict arose from defense counsel's representation of a named witness, the question is whether the named witness stood to benefit from the defendant's conviction." (Emphasis omitted.) *Id.* ¶ 34 (citing *Morales*, 209 Ill. 2d at 347). It further determined as follows:

> "Here, we need not speculate about whether *** Wilson stood to benefit from the defendant's conviction. *** Wilson, quite importantly, is the mother of [defendant's] codefendant ***, who was tried separately from the defendant and who was the only other suspect in the murder. Notably, [the] codefendant *** was acquitted of all charges in this case. It is reasonable to infer that *** Wilson would benefit if the defendant, rather than her son, was convicted." (Emphasis omitted.) *Id.*

¶ 46 Here, we find *Matthews* unpersuasive. Initially, in *Matthews*, the First District did not explicitly address the majority holding in *Morales* that a *per se* conflict does not exist when a defendant's counsel represents only a *potential* prosecution witness. Instead, the *Matthews* court appears to have relied on the conflicting rationale of the special concurrence. For the reasons

- 16 -

already stated, we are bound by the majority holding in *Morales.*

¶ 47 Additionally, the *Matthews* court relied heavily on the defendant's well-pled factual allegation that Wilson, the potential prosecution witness, "stood to benefit from the defendant's conviction." (Emphasis omitted.) *Id.* In particular, it noted that Wilson was the mother of the defendant's codefendant, who was the only other suspect in the charged murder, tried separately from the defendant, and ultimately acquitted of all charges. As discussed, defendant's claim in this case that Watts had a stake in the outcome of his trial was conclusory and speculative.

¶ 48 Under the circumstances presented, we find defendant's amended postconviction petition failed to make a substantial showing of a constitutional violation based upon the claim that he did not receive effective assistance of counsel due to a *per se* conflict of interest. Accordingly, the trial court committed no error in granting the State's motion to dismiss defendant's amended postconviction petition.

¶ 49 B. Unreasonable Assistance of Postconviction Counsel

¶ 50 On appeal, defendant also argues that his postconviction counsel provided unreasonable assistance by abandoning defendant's viable *pro se* claim that his 65-year sentence, a "*de facto* natural life sentence," was unconstitutional under the proportionate penalties clause of the Illinois Constitution. He contends that because the representation he received was unreasonable, he is entitled to remand for further second-stage postconviction proceedings.

¶ 51 The sixth amendment right to the effective assistance of counsel does not apply in a postconviction proceeding. *People v. Custer*, 2019 IL 123339, ¶ 30, 155 N.E.3d 374. Instead, the Act requires only that postconviction petitioners receive a reasonable level of assistance, "a standard that is significantly lower than the one mandated at trial by our state and federal constitutions." *Id.* One reason for applying a lower standard in a postconviction case is that a

defendant's presumption of innocence "is stripped away" upon conviction. *Id.* ¶ 31.

¶ 52 Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) applies when the trial court appoints counsel for a defendant who initially filed a *pro se* postconviction petition. *People v. Cotto*, 2016 IL 119006, ¶ 41, 51 N.E.3d 802. "Commensurate with the lower reasonable assistance standard mandated in postconviction proceedings, [Rule 651(c)] sharply limits the requisite duties of postconviction counsel." *Custer*, 2019 IL 123339, ¶ 32. It requires that postconviction counsel certify that he or she has (1) consulted with the defendant by phone, mail, electronic means or in person to ascertain the defendant's contentions of deprivation of constitutional rights, (2) examined the record of the proceedings at the trial, and (3) made any amendments to the defendant's *pro se* petition that are necessary for an adequate presentation of the defendant's contentions. Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 53 "Although strict compliance is not necessary, postconviction counsel must substantially comply with Rule 651(c)." *People v. Mason*, 2016 IL App (4th) 140517, ¶ 19, 56 N.E.3d 1141. "The filing of a facially valid Rule 651(c) certificate creates a rebuttable presumption that counsel acted reasonably and complied with the rule." (Internal quotation marks omitted.) *People v. Beasley*, 2017 IL App (4th) 150291, ¶ 39, 85 N.E.3d 568; see also *Custer*, 2019 IL 123339, ¶ 32 ("Postconviction counsel may create a rebuttable presumption that reasonable assistance was provided by filing a Rule 651 certificate."). Whether postconviction counsel provided reasonable assistance is reviewed *de novo*. *People v. Jones*, 2017 IL App (4th) 140594, ¶ 31, 72 N.E.3d 449.

¶ 54 As set forth above, defendant argues his postconviction counsel acted unreasonably by omitting one of his *pro se* claims from the amended petition counsel filed on defendant's behalf. Notably, he does not dispute that his postconviction counsel filed a valid Rule 651(c) certificate.

¶ 55 We note that fulfillment of Rule 651(c)'s obligation that postconviction counsel make necessary amendments to a *pro se* petition "does not require postconviction counsel to advance frivolous or spurious claims on defendant's behalf." *People v. Greer*, 212 Ill. 2d 192, 205, 817 N.E.2d 511, 519 (2004). "If amendments to a *pro se* postconviction petition would only further a frivolous or patently nonmeritorious claim, they are not 'necessary' within the meaning of the rule." *Id.* Where postconviction counsel has filed a valid Rule 651(c) certificate that gives rise to a rebuttable presumption of reasonable assistance, "the question of whether the [defendant's] *pro se* allegations had merit is crucial to determining whether counsel acted unreasonably by not filing an amended petition." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 23, 974 N.E.2d 813. The same analysis applies when postconviction counsel files an amended petition and omits a *pro se* claim. See *People v. Turner*, 2022 IL App (2d) 210753, ¶ 11 ("It follows that, where counsel does file an amended petition, the reasonableness of counsel's choice to omit a particular *pro se* claim from the amended petition likewise depends on the merits of that claim."); *People v. Blake*, 2022 IL App (2d) 210154, ¶ 15 ("[W]hen counsel chooses to omit *pro se* claims from an amended petition, the reasonableness of that choice depends on the merits of the *pro se* claims.").

¶ 56 Here, in his *pro se* postconviction petition, defendant raised a claim that his 65-year prison sentence violated the proportionate penalties clause of the Illinois Constitution as applied to him. Essentially, he argued that as a 19-year-old young adult offender, his brain development was similar to that of a juvenile and, as a result, he was entitled to, but did not receive, the same *Miller*-based sentencing considerations as a juvenile offender.

¶ 57 In *Miller*, 567 U.S. at 479, which was decided in 2012, the United States Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." In reaching its decision, the Court referenced

scientific research that showed "fundamental differences between juvenile and adult minds" and noted prior case authority establishing that children are constitutionally different from adults for sentencing purposes. (Internal quotation marks omitted.) *Id.* at 471-72. "Because juveniles have diminished culpability and greater prospects for reform, *** they are less deserving of the most severe punishments." (Internal quotation marks omitted.) *Id.* at 471. The Court concluded "mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476. It held that a sentencing court must have the ability to consider a juvenile offender's youth and its attendant characteristics before imposing a particular penalty. *Id.* at 483.

¶ 58        In Illinois, *Miller* has been extended to cases involving juvenile offenders sentenced to *de facto* life sentences (*People v. Reyes*, 2016 IL 119271, ¶ 9, 63 N.E.3d 884) and discretionary sentences of life without parole (*People v. Holman*, 2017 IL 120655, ¶ 40, 91 N.E.3d 849). A *de facto* life sentence is one that is greater than 40 years. *People v. Buffer*, 2019 IL 122327, ¶ 42, 137 N.E.3d 763. Additionally, as defendant notes, supreme court case authority has suggested that proceedings under the Act are an appropriate avenue for a young adult offender to raise an as-applied, constitutional challenge to his sentence based on the reasoning in *Miller*. See *People v. Harris*, 2018 IL 121932, ¶¶ 46, 48, 120 N.E.3d 900; *People v. Thompson*, 2015 IL 118151, ¶ 44, 43 N.E.3d 984.

¶ 59        On appeal, defendant argues his *pro se* claim alleging a violation of the proportionate penalties clause based on *Miller* was a "viable" claim. He contends his 65-year sentence was a *de facto* life sentence. Defendant also argues that he sufficiently alleged (1) that the brain-development research applicable to juvenile offenders applied equally to him as a young adult and (2) the trial court did not properly consider his youth and its attendant characteristics at

the time of sentencing. The State responds that defendant's postconviction counsel did not act unreasonably by failing to pursue the above claim. It contends the claim was both forfeited by defendant's failure to raise it on direct appeal and is without merit.

¶ 60　　　　Initially, we disagree that forfeiture applies in this instance. The State correctly notes that in a postconviction proceeding, forfeiture bars a defendant from raising "issues that could have been raised [on direct appeal], but were not." *People v. Blair*, 215 Ill. 2d 427, 443-44, 831 N.E.2d 604, 614-15 (2005). When forfeiture precludes "a defendant from obtaining relief, such a claim is necessarily 'frivolous' or 'patently without merit.' " *Id.* at 445. However, "omitting a claim in the direct appeal will not result in a forfeiture of the claim in a subsequent postconviction proceeding if the record on direct appeal did not provide the means of raising the claim." *People v. Wrencher*, 2015 IL App (4th) 130522, ¶ 23, 31 N.E.3d 815. In this instance, defendant's *pro se* claim depended, at least in part, on evidence outside the appellate record, *i.e.*, the science regarding brain development that could establish his similarity to a juvenile offender. See *Harris*, 2018 IL 121932, ¶ 46 (noting the record on direct appeal did "not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applie[d] to [the young adult] defendant's specific facts and circumstances").

¶ 61　　　　Additionally, we note that "an exception" to the forfeiture doctrine exists in postconviction proceedings. *People v. Turner*, 187 Ill. 2d 406, 413, 719 N.E.2d 725, 729 (1999). Specifically, a postconviction petitioner may overcome the procedural bar of forfeiture by alleging ineffective assistance of appellate counsel for failing to raise an issue on direct appeal. *Id.* We note "the purpose of Rule 651(c) is to ensure that [postconviction] counsel shapes the petitioner's claims into proper legal form and presents those claims to the court." *People v. Perkins*, 229 Ill. 2d 34, 44, 890 N.E.2d 398, 403 (2008). "An adequate or proper presentation of a petitioner's

substantive claims necessarily includes attempting to overcome procedural bars *** that will result in dismissal of a petition if not rebutted." *Id.* Here, assuming defendant's *pro se* claim had merit and that the appellate record provided the means for raising the claim on direct appeal, postconviction counsel could be deemed to have acted unreasonably by failing to pursue the claim and to amend it to prevent application of the forfeiture doctrine.

¶ 62        Although we are not persuaded by the State's forfeiture argument, we do agree with its contention that defendant's *pro se* claim lacked merit. To establish an as-applied constitutional challenge to his sentence based on *Miller*, defendant, as a young adult offender, had to show that:

> "(1) at the time of the commission of the underlying offense, his or her own specific characteristics—those related to youth, level of maturity, and brain development— placed him or her in the same category as juvenile offenders described in *Miller* and (2) his or her sentencing was not *Miller* compliant, in that a life sentence was imposed without regard for the offender's youth and its attendant characteristics."
> *People v. Cortez*, 2021 IL App (4th) 190158, ¶ 47, 185 N.E.3d 316.

In this case, assuming that defendant can show his entitlement to *Miller*-related sentencing considerations, we find he cannot establish that his sentencing was not *Miller* compliant.

¶ 63        The record shows defendant received a discretionary, *de facto* life sentence. As stated, the supreme court has held that *Miller* applies to discretionary life sentences imposed upon juvenile offenders. *Holman*, 2017 IL 120655, ¶ 40; but see *People v. Dorsey*, 2021 IL 123010, ¶¶ 40-41, 183 N.E.3d 715 (stating *Holman*'s holding that *Miller* applies to discretionary life sentences was "questionable" given the Supreme Court's recent decision in *Jones v. Mississippi*, 539 U.S. __, __141 S. Ct. 1307, 1314 (2021), stating that *Miller* rejected the idea that more than a discretionary sentence for juvenile offenders is required). In setting forth what it meant to apply

*Miller*, the *Holman* court stated as follows:

> "[A] juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 64    An inquiry into whether a sentencing hearing comported with the requirements of *Miller* "looks back to the trial and the sentencing hearing to determine whether the trial court at that time considered evidence and argument related to the *Miller* factors." *People v. Lusby*, 2020 IL 124046, ¶ 35, 182 N.E.3d 563 (citing *Holman*, 2017 IL 120655, ¶ 47). Additionally, under a *Holman* analysis, "a key feature of the juvenile's sentencing hearing is that the defendant had the 'opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility.' " *People v. Croft*, 2018 IL App (1st) 150043, ¶ 23, 100 N.E.3d 577 (citing *Holman*, 2017 IL 120655, ¶ 49); see also *Lusby*, 2020 IL 124046, ¶ 52 (finding the juvenile

defendant's *de facto* discretionary life sentence passed constitutional muster under *Miller*, where defendant had the opportunity to present mitigating evidence but chose not to and the record showed "[t]he trial court presided over the case from beginning to end and considered the defendant's youth and its attendant characteristics before concluding that his future should be spent in prison").

¶ 65　　　　　Here, the record shows that defendant clearly had the opportunity to present evidence at his sentencing hearing that was relevant to his youth and its attendant characteristics. Although he chose not to present any evidence or testimony, his PSI contained information pertinent to the characteristics of his youth, including his age, his familial and criminal background, and his level of education. His counsel also presented argument to the trial court that a less severe sentence was warranted based on defendant's youth, his lack of an adult record, and because his crimes were facilitated by another.

¶ 66　　　　　In his *pro se* petition, defendant argued the sentencing court failed to consider his age, that he was minimally culpable with respect to the charged offenses, and his lack of a prior violent criminal history. However, the record does not support his argument. The trial court stated that it had "studied" defendant's PSI, which defendant points to on appeal as containing "facts specific to [defendant] that would have impacted his brain development." The court also explicitly recognized defendant's youth. Further, the court's comments, both at defendant's sentencing hearing and at the hearing on his motion to reconsider his sentence, show the court considered and rejected any argument that defendant was only minimally culpable for the charged offenses.

¶ 67　　　　　The sentencing court's comments further show that although it recognized that defendant was a youthful offender, it believed a significant sentence was warranted by the "horrendous" circumstances of the underlying offenses. The court found defendant posed "a threat

to *** society" and that he had committed additional, similar armed robberies close in time to Suggs's murder. In denying defendant's motion to reconsider, in which defendant explicitly argued the court failed to consider his rehabilitative potential, the court described defendant as "wreaking havoc in the area [in] a very short time before" Suggs's murder.

¶ 68     Accordingly, even assuming defendant could show that his own specific characteristics as a 19-year-old offender placed him in the same category as a juvenile offender, he could not show that his 65-year sentence was imposed without regard for his youth and its attendant characteristics. In other words, defendant's sentencing hearing was *Miller* compliant, and his *pro se* claim alleging a violation of the proportionate penalties clause based on *Miller* and its progeny lacks merit. Because we find defendant's *pro se* claim has no merit, his postconviction counsel could not have acted unreasonably by failing to raise it in the amended postconviction he filed on defendant's behalf. We hold defendant is not entitled to additional second-stage postconviction proceedings.

¶ 69                                III. CONCLUSION

¶ 70     For the reasons stated, we affirm the trial court's judgment.

¶ 71     Affirmed.